Mel J. HILL, et al.   Plaintiffs,

v.

REPUBLIC OF IRAQ, et al.   Defendants.

No. 1:99CV03346 (TPJ).

United States District Court, District of Columbia.

Dec. 5, 2001.

Mark McLaughlin Hager, American University, Washington College of Law, Washington, DC, Daniel Wolf, Michael D. Lieder, Cynthia J. Totten, Sprenger & Lang, P.L.L.C., Washington, DC, for Mel J. Hill, Vivian C. Hill, Michael Barner, Richard Biasetti, Shane Foley, Jack Frazier, Cheryl Graham, As executor of estate of Lloyd Graham, David O. Morris, Mike Nickman, James P. Roach, plaintiffs.

Mark McLaughlin Hager, American University, Washington College of Law, Washington, DC, Steven Michael Sprenger, Daniel Wolf, Michael D. Lieder, Cynthia J. Totten, Sprenger & Lang, P.L.L.C., Washington, DC, for Young Hee Roach, Susan E. Vinton, Charlie Amos, Sarrah Amos, Petrica Brown, Richard Guy Sementelli, William Van Dorp, Floyd Watson, Mary Watson, plaintiffs.

Daniel Wolf, Sprenger & Lang, P.L.L.C., Washington, DC, for Charles Coutre, Timothy Glenski, Gene Lovas, Myrl Lynn, B.J. Tinch, Stuart Williams, movants.

## DECISION AND ORDER

JACKSON, District Judge.

In the summer of 1990 military ground forces of the Republic of Iraq crossed its border with Kuwait, invested the capital of Kuwait City, and seized control of the country with the objective of annexing it to Iraq. Kuwait's resistance was minimal, and within hours Kuwait was an occupied country.

In conjunction with its invasion of Kuwait, Iraq quarantined all foreign nationals then present within the borders of the two countries, denying them visas to depart. When international opposition to the invasion developed to the point at which military action against Iraq appeared likely, Iraq declared that the foreign nationals would be detained indefinitely "so long as Iraq remains threatened by an aggressive war." The detainees were promptly characterized as hostages—"innocent people, citizens of many nations, held against their will in return for concessions"—by the President of the United States who an-

nounced that Iraq would be held responsible for "the safety and well-being" of those who were Americans.[1]

The U.S. Department of State estimated at the time that there were approximately 30,000 foreigners of all nationalities confined within the borders of Iraq and Kuwait, of whom 2500 were Americans. Their captivity began August 2, 1990, the day of the Iraqi invasion of Kuwait. It ended mid-December, 1990, when the last were allowed to depart. In the interim they survived, day-to-day, under conditions of greater or lesser adversity, none of which were, however, conducive to their safety and well-being.

## I.

This action was commenced by approximately a score of United States citizens (or their personal representatives) who were detained against their will in Kuwait and Iraq between August and December, 1990. They sue the Republic of Iraq and its President, Saddam Hussein, for money damages for hostage-taking, false imprisonment, personal injury, intentional infliction of emotional distress, and in some cases assault, battery, and loss of consortium. The action is brought pursuant to certain 1996 amendments to the Foreign Sovereign Immunities Act, 28 U.S.C.

§§ 1602–1611 ("FSIA") allowing such actions to be brought for the first time by private citizens against foreign sovereign nations and their agents and instrumentalities.

Subject matter jurisdiction of this Court derives from 28 U.S.C. §§ 1330(b) and 1605(a)(7) and venue in the District of Columbia is provided for by 28 U.S.C. § 1391(f)(4). The original complaint was filed on December 15, 1999, and an amended complaint, adding new plaintiffs, was filed July 19, 2000. Both were properly served on defendants pursuant to 28 U.S.C. § 1608(a)(4) on April 19, 2000, and October 17, 2000, respectively.[2] The defendants failed to plead or otherwise defend the action, and the Clerk of Court declared them in default on January 16, 2001.[3] Accordingly, the Court held an evidentiary hearing on October 9–13, 2001, to be later supplemented by declarations submitted under oath by non-testifying plaintiffs, from which the facts set forth below are found pursuant to Fed.R.Civ.P. 52(a) upon evidence satisfactory to the Court.[4]

## II.

Of the 2500–odd Americans believed to have been present in Kuwait or Iraq on August 2, 1990, to whom exit was refused

---

1. "American Foreign Policy Current Documents 1990," U.S. Department of State (1991), Pl.Ex. 1, pp. 1–3.

2. Motions to amend the complaint to add plaintiffs were also granted on May 1, July 8, August 5, October 4, October 10, and November 27, 2001, after default had been entered. At present there are 172 named plaintiffs. No others will be added to this civil action by motion.

3. On November 15, 2000, the Court advised the Attorney General of the pendency of the action and invited the participation of the United States to attend to such interests as it might have therein pursuant to 28 U.S.C.

§ 517. On January 23, 2001, the United States declined the invitation.

4. No judgment of default may be entered by a Court of the United States against a foreign state unless a claimant establishes a right thereto by evidence satisfactory to the court. *See* 28 U.S.C. § 1608(e).

In the circumstances the Court interprets the requirement to call for proof by evidence of a nature and quality sufficient to support summary judgment under Fed.R.Civ.P. 56, namely, oral or written testimony under oath, made upon personal knowledge by witnesses competent to testify to the matters stated therein. *See* Fed.R.Civ.P. 56(e).

by Iraqi authorities, approximately half or more, eluded capture and escaped on their own. Others eluded capture for a time and took temporary refuge in private dwellings of relatives or friends until apprehended. Some were interned in hotels, at a U.S. Embassy, or an ambassadorial residence. A particularly unfortunate number were transported to various industrial or military sites throughout Iraq and confined in close proximity to anticipated targets of air strikes by allied aircraft once military operations by coalition forces against Iraq commenced.

All of them, to varying degrees, were subject to privations and hardships, and forced at gunpoint to remain where they were placed or transported. They were obliged to forage for sustenance or were maintained by their captors on minimal rations of often spoiled foodstuffs. They were deprived of sanitary facilities, changes of clothing, and medical supplies. Even drinking water was in short supply, as was shelter from desert heat or cold. Some were forced to inhabit impossibly congested and vermin-infested sleeping quarters. And they were all kept in constant fear throughout for their lives, acutely conscious of the indeterminate duration of their captivity, and the unknown fate of family members from whom they were separated, both in-country and at home.

According to the testimony of former Ambassador Morris D. Busby, Coordinator for Counterterrorism of the U.S. Department of State from 1988 to 1991, it was the Iraqi strategy at the time to use the foreigners in its custody as bargaining commodities—to extract concessions from the United States and its coalition allies in exchange for their release, and until their release to take advantage of their presence to moderate any military reprisals by the allies.

The accounts given by the several witnesses who gave live testimony typify the experiences of other plaintiffs whose evidence was supplied by declaration.[5]

### The "Human Shield" Hostages

### Charles Joseph Kolb

In August, 1990, Kolb was a U.S.-born 29–year–old English teacher employed by the U.S. Department of State to teach English at the American Cultural Center in Baghdad, Iraq. He had lived in Baghdad for nearly a year and was at the time engaged to marry an Iraqi woman. Informed by a friend that foreigners were being taken into custody on August 2nd, he remained primarily in seclusion in his residence, contacting no one. On August 28th he returned to his house after a short foray outdoors to find Iraqi security police present, and fled to his office only to find Iraqi authorities there as well. He was arrested, detained at a hotel for two days, then driven by bus with about 20 other Westerners who were dropped off at various places of detention about the city.

Kolb was eventually taken to the Dohra Oil Refinery, a working refinery just outside Baghdad, with two other men. He lived there in a small house for about a month, during which he was homosexually molested by a guard on one occasion. He and other Western males were then again driven by bus some 240 kilometers north to an underground complex of an unknown

---

**5.** The case was originally filed as a class action on behalf of the named plaintiffs and all other persons similarly situated pursuant to Fed.R.Civ.P. 23(a) and (b)(3). The Court declined to certify a class in light of the fact that the case was proceeding by default; the uncertainty of the numbers of U.S. citizens who could actually qualify as a victim or claimant; and the significant variations in the experiences of the hostages, including hardships endured and compensable injuries suffered.

character in the desert near Kirkuk where they lived two men to a shack. They had no running water or electricity and were permitted to leave the shack for meals only. Several days later they were moved once more to a nearby gas refinery where they slept on cots in a vermin-ridden storage shed. They were fed meals of rice and bread twice a day.

Kolb remained at the gas refinery until mid-December when the last of the hostages were released. (Others of his co-hostages had left from time to time earlier.) He and three remaining companions were driven by pickup truck back to Baghdad. He was detained at a hotel for several days until an exit visa was arranged for him. He returned to the U.S. via Frankfurt on December 18th. In the course of his detention he suffered from chronic diarrhea and lost 25 to 30 pounds.

He never saw his fiancée again, and has abandoned any thought of ever returning to the Middle East.

*Apostolos Eliopoulos*

Eliopoulos was born in Athens, Greece in July, 1952, and became a naturalized U.S. citizen in 1982, as did his wife, Angela, whom he married in 1976. With a degree in technology management from the University of Maryland, he became a computer programmer, worked as such in Saudi Arabia, Bahrain, and Kuwait, and in June, 1990, began a new job with the Kuwait office of Arthur Anderson & Co. He was Arthur Anderson's sole representative in Kuwait, providing consulting services to such clients as Kuwaiti Airways and the Kuwaiti Department of the Interior, and had been promised a full partnership in the company as of September, 1991.

Eliopoulos celebrated his 38th birthday barely a week before the Iraqi invasion on August 2nd. He and his family—wife, son, and daughter—had been living in Kuwait for over three years, and had established their home in a suburb of Kuwait City.

On August 2nd, Angela and the children were away on vacation in Greece. Eliopoulos was awakened at home by a call from the U.S. Embassy alerting him to the invasion and instructing him to stay at home indoors. Two days later he and two companions had ventured out for supplies when their car was stopped by Iraqi troops, and they were taken into custody at gunpoint even as the Iraqis were actually returning the fire of Kuwaiti troops nearby. (A captured Kuwaiti was executed by a gunshot to the head in their presence.)

Eliopoulos and his companions were transported by truck to various official buildings in the city, interrogated along with other miscellaneous prisoners the Iraqis had rounded up. The Kuwaiti soldiers among the prisoners were tortured and beaten.

Eventually Eliopoulos and other captives, both Kuwaitis and Westerners, were transported by lorry to the Kuwait–Iraq border, held briefly, and then driven with numerous others into Iraq to concentration camps in the vicinity of Basra. At one point they had reason to fear their own executions; at another they witnessed the summary execution of another Kuwaiti soldier. They were given no water, although the daytime temperature was 120 degrees.

In mid-August they were transported once more to a hotel in Basra, and after a stay of approximately 10 days, moved yet again, first to a phosphate plant, then to a hydroelectric power station some 200 kilometers north of Baghdad, and ultimately to a urea plant. At each destination the hostages were quartered, in sub-civilized conditions, in the midst of the industrial facilities they knew were likely military targets.

Eliopoulos remained at the urea plant for three months. The first week in December he was driven to a hotel in Baghdad where he was met by his wife, and a few days later flown to Frankfurt, Germany.

In March, 1991, Eliopoulos journeyed back to Kuwait with some thought of resuming his life there. He found his house in ruins, and looted, his possessions gone. He was emotionally unable to resume his work in Kuwait, and Arthur Anderson & Co. dismissed him.

*Bill Rodebush*

Rodebush was a 53–year–old U.S.-born oil field supervisor for an American subcontractor conducting drilling operations at a Kuwaiti-owned oil field in northeast Kuwait in August, 1990. He had been in Kuwait on-and-off since 1984. On August 2nd the rig he was working was situated 25 to 30 miles from the Iraq–Kuwait border. He was awakened in the early morning hours by reports of an invading column of Iraqi troops along the nearby Basra–Kuwait City highway. Shortly thereafter he and his co-workers were accosted by a tank-supported unit of Iraqi soldiers who robbed them at gunpoint, then forced them onto buses and drove them to a "P.O.W. camp" where they were commingled with some 500 other prisoners of all nationalities.

After several other changes of location Rodebush and other captives were flown from Basra to Baghdad, always under armed military guard. In Baghdad they were separated by nationality for the first time and placed in the custody of civil police. All Americans were confined to a single hotel, and remained there for approximately two weeks, during which time the American embassy was able to arrange for them to send powers-of-attorney to relatives in the U.S. (They had been told by a visiting U.S. newsman that they should expect to remain captives for a long time, "because you're pawns in a big game.")

About August 17th Rodebush and 36 other Americans, both male and female, were placed on buses and driven northwest several hours to a phosphate factory at Al Q'aim, close to the Syrian border. They were housed, two to a decrepit hut, within a garbage-strewn compound surrounded by a chain-link fence (and populated with feral cats), just yards away from the factory proper.

After two weeks at Al Q'aim the women and children were released, and Rodebush and some other men were taken back to Baghdad to a missile factory on the outskirts of the city. Once again they occupied vermin-infested huts in a compound adjacent to the factory. Food was cooked for them on a grill placed over an open sewer drain. On one occasion, after a night of observing antiaircraft drills involving live fire from batteries surrounding the factory, they were moved into the factory itself. On another they spent a week at a second missile factory south of the city.

By the end of September Rodebush had developed chronic diarrhea, foot drop, and severe back pain. He was moved again, to a nearby munitions plant where he remained until December 8th, the longest period he was to remain at a single location during his captivity, where conditions were the worst he had encountered.

His release was privately negotiated: He was told American oil company executives had been able to trade a planeload of medical supplies for the release of oil-industry captives. Upon Rodebush's return to the United States he discovered that his mother had suffered what proved to be a fatal stroke, and his wife had become seriously ill. Some of his own medical problems had become permanent.

### The Fugitive-at-large and Interned Hostages

#### Taleb Nabil Subh

Taleb Subh, born August 5, 1975, in Iowa (and thus a U.S. citizen) was a 14–year–old visitor at the home of his father's sister in Kuwait in August, 1990. He awakened on August 2nd to the sound of military vehicles on the streets of the city and was told by his frightened relatives of the invasion. Subh's parents were traveling in the United States at the time, but he was able to speak briefly by telephone with an uncle in the U.S. who cautioned him to do as his aunt told him. By the time he tried to reach his parents, all telephone connections to the United States had been severed.

His aunt's husband worked for the Kuwaiti royal family, and knew he would be a person of special interest to the Iraqi authorities. Consequently, he fled into hiding, and Subh and his aunt remained in seclusion in their apartment for a week while Iraqi troops patrolled the streets outside. Once, on a surreptitious visit to the roof of the building, Subh observed the summary execution of a Kuwaiti civilian by Iraqi troops with a pistol shot to the head.

Apprehensive that, if caught, her young nephew would not fare well in Iraqi custody as a U.S. citizen, and that her household would be punished for harboring him, Subh's aunt determined to move him to a relative's house. She undertook to drive him through the city, passing several checkpoints en route. Subh does not speak Arabic. Iraqi troops manning the checkpoints shouted at him in Arabic while holding a gun to his head. His aunt was somehow able to explain his unresponsiveness to interrogation in Arabic to the Iraqis' satisfaction, and Subh arrived safely at the home of another aunt. During the week he resided with her he was aware of sounds of nearby gunfire and screams of neighbors being taken into custody.

Still fearful that they would be caught harboring an American, his relatives moved him yet again through the city (and checkpoints) to the home of a family friend, and then back to the first aunt's apartment. On each foray he was confronted with scenes of atrocities encountered along the way.

At the end of August Subh's relatives devised a plan to smuggle him to Baghdad to the U.S. Embassy which they understood to be still functioning, although the embassy in Kuwait had been closed. As they were departing the party encountered two dying victims of Iraqi violence, but his escorts would not allow Subh to tarry to aid them.

The trip to Baghdad took 16 hours by automobile. Subh's cousin—an Irish citizen—drove. When questioned they purported to be Palestinians. Along the way they passed other cars, incinerated derelicts at road-side with charred bodies inside. Once again checkpoints were negotiated with a ruse as to why Subh was unable to speak.

Once in Baghdad they were directed to a hotel, and were able in a day or two to get word to the American embassy, via the Irish embassy, of Subh's whereabouts. Shortly thereafter a detachment of U.S. Marines arrived at the hotel to escort Subh to the embassy and safety. Two days later he was flown to Amman, Jordan, and thence ultimately to the United States on September 6, 1990, where he was reunited with his parents.

#### The Virgil Graham Family

Rev. Graham, a Baptist missionary, observed his 41st birthday on August 14, 1990, on the grounds of what remained of the U.S. Embassy in Kuwait City. A U.S. citizen born in Tennessee, Rev. Graham,

his wife Laurie, 40, a music teacher, and their two sons, Peter and Aaron, ages 13 and 10, also U.S. citizens, arrived in Kuwait in the early summer of 1990 where Rev. Graham had taken a position as pastor of the National Evangelical Church of Kuwait. They had recently completed three years of missionary service in Liberia, West Africa.

On August 2, 1990, the Grahams were residing in the church "manse," or parsonage. They awakened to the sound of artillery fire, and learned via a call to a friend at the U.S. Embassy of the invasion. Beginning at about 8:30 a.m. detachments of Iraqi troops made a series of forced entries into the house, at first in quest of Kuwaiti citizens, later for other purposes. On one occasion, four Iraqi soldiers, armed with automatic rifles, held the family at gunpoint. One of the soldiers fondled Laurie's breast in a manner to cause her to fear she would be raped in the presence of her sons, although the soldier desisted in the end. A second group of soldiers forcibly disconnected their telephone. Inquiries made by the soldiers were directed at attempting to discover a connection between the Grahams and the U.S. Government.

At about 2:00 p.m. the family fled the house in their automobile, which had been badly damaged by gunfire, observing combat casualties along the way as they drove to the house of the U.S. consul to seek refuge. They remained at the consul's home for four days, along with more than 20 other Americans and others. The refugees considered and rejected various plans to escape from Kuwait: The borders were closed, and all international telephone connections severed; travel across the open desert in summer appeared too hazardous.

On August 6th all American diplomatic personnel were summoned to the U.S. Embassy, and the Grahams accompanied them. At the embassy they discovered about 160 others on the premises. The perimeter beyond the high compound walls was patrolled by Iraqi troops, and the inhabitants were locked inside.

The Grahams slept on the floor of a trailer on the embassy grounds. Food supplies were limited and dwindled rapidly. On August 24th the Iraqi authorities ordered the U.S. Embassy officially closed—Kuwait being for Iraq's purposes no longer a separate sovereign country—and forced the U.S. diplomatic personnel to depart for Baghdad, leaving about 30 private citizens in residence, along with a few caretaker diplomats. The Iraqis then turned off the electricity and fresh water supply to the embassy. Air conditioning ceased. The only water to be had was found in cisterns on the embassy roof. Daytime temperatures reached 130 degrees.

As time passed the Iraqis tightened security around the embassy compound, surrounding it with land mines and positioning canisters of what the hostages were told was mustard gas. Tanks reinforced the foot patrols by the sentries.

In mid-September Laurie and the boys were permitted to leave, along with others for whom release had been arranged. Rev. Graham watched them depart for the airport with great anxiety as Iraqi soldiers took them into custody for the trip. (They arrived safely in the United States, however, a few days later.)

Conditions at the embassy compound continued to deteriorate. The stagnant water in the cisterns grew foul; the remaining inhabitants tried to decontaminate it with laundry bleach. They dug a well to augment the meager water supply. They also dug a pit down to, and punctured, the sewer line, enabling them to erect a makeshift latrine/outhouse over the pit. Once

the electrical service ceased any perishable food remaining at the embassy spoiled for want of refrigeration. Their rations were reduced to what remained of the rice and canned tuna in the embassy pantry, cooking the rice over fires they built with broken furniture. In early October rumors of an impending attempt at forcible rescue prompted Rev. Graham to tape record a farewell message to his family in case he did not survive it. (The rescue never materialized.)

The embassy hostages, along with all the rest remaining in both countries, were released on December 9, 1990, at the direction of Saddam Hussein himself. The private citizens assisted the remaining diplomats in getting word to an estimated 300 others known to be still in hiding and scattered throughout Kuwait.

Even the departure became a harrowing experience. Several hundred hostages were assembled by Iraqi troops in a closed aircraft hanger, and they experienced several minutes of extreme terror at the possibility that they would be gassed, until the hangar door opened to reveal an Iraqi Airlines plane on the tarmac.

Rev. Graham and his companions were flown to Baghdad, then on to Germany, and to home the following day.

*Jack Frazier*

Bechtel Corporation, an American company with a worldwide business, operated an Iraqi oil refinery outside Baghdad under a contract with TechCorps, an Iraqi government corporation. In August, 1990, Jack Frazier, a 53–year–old former U.S. Marine, born in Montana, had been employed by Bechtel as a field superintendent at the refinery for two years. He commuted daily from Baghdad to the refinery by company bus.

Frazier was single at the time, but engaged to his current wife, Deanna, who had remained in the United States. His only medical problem was a mild diabetes that he controlled with daily medication.

After Iraq invaded Kuwait the Bechtel Corporation refinery workers were confined by Iraqi authorities to the Istar hotel and the TechCorps offices. After two weeks, upon hearing a rumor that the Iraqi military planned a roundup of U.S. citizens, some of the workers planned a dash through the city to the protection of the U.S. Embassy. Frazier packed some rations and a three-day supply of his diabetes medication; the parcel containing his medicine was snatched from his hand as he departed.

Upon his arrival at the ambassador's residence Frazier found some 55 other Americans already there, crowded into four bedrooms. The front and rear of the building were guarded by Iraqi sentries with fixed bayonets.

Around September 1st some of the women and children were allowed to leave. In the meantime, however, some of the males and their families had been lured to TechCorps headquarters with a promise of release, only to be taken into custody and dispersed to various potential military targets as "human shields."

Even those who remained at the ambassadorial residence were concerned about the prospect of military action against Iraq: The presidential palace, a chemical plant, and a strategic bridge across the Tigris River were nearby, and antiaircraft batteries were sited close at hand. Iraqi citizens had been organized to demonstrate their hostility to the U.S. on the streets outside, and would easily have been able to invade the premises at any time.

Frazier was eventually allowed to leave Iraq on October 23rd as a medical hardship case. By that time he had been without his diabetes medication since mid-Au-

gust. He had lost sight in his right eye, and was fearful of the imminent loss of his left eye. (He later learned that his fiancee had on three occasions tried to dispatch medication to him, but he had received none of it.) He was also unable to maintain a diabetic diet. Such food as he was able to obtain—none, by the way, supplied by his Iraqi captors—exacerbated his diabetes.

## David Morris

David Morris, too, was a Bechtel Corporation employee, having worked as a project procurement manager at a petrochemical complex operated by TechCorps since March, 1990. On August 2, 1990, he was 49 years old, single but engaged to a woman at the time, and living in Baghdad. After the invasion he was interned, along with other Bechtel employees who were U.S. citizens, at a hotel for two weeks, then allowed to move into the U.S. embassy residence once the "human shield" rumors began circulating.

Morris remained at the ambassadorial residence until the end, when all remaining hostages were released on December 12th. After the departure of the dependents, and males with medical problems such as Frazier's, apprehensions rose among those who remained as news reports warned of impending military action and mobs demonstrating in the streets outside grew more hostile.

## Penelope Nabokov

Penelope Nabokov was a ten-year-old child living in California in August of 1990. She was traveling unaccompanied on a British Airways flight from London to Madras, India, to join her mother, a cultural anthropologist doing field work in India. In the early morning hours of August 2nd the plane landed to refuel in Kuwait City, but was not allowed to depart. The passengers—300 of them—were debarked, detained for hours in the terminal, and then boarded on buses and taken to a local hotel. Their luggage remained on the plane.

Penelope was taken in charge by the flight attendants, who roomed with her and an older girl for the six days they remained at the hotel. The Iraqi military presence was every where in evidence. She was unable, as were all the hostages, to contact her family by telephone, but, as a child, she was primarily upset that they had not called her. Although at first not particularly alarmed, as time passed she became more fearful as she overhead frightened conversations between the flight attendants.

On the sixth day armed Iraqi troops took the passengers by bus to another hotel in Basra and separated them by nationalities, and Penelope attached herself to a British family. The following day they were taken to Baghdad by train. The U.S. Embassy had been informed of Penelope's presence among the British hostages and sent for her. From the embassy she was able for the first time to contact her mother in Madras by phone. She resided with a diplomatic family for two days, and then joined a caravan of vehicles bearing other refugees for an 18–hour drive to Amman, Jordan. From Amman she flew to Paris on or about August 13th where she was reunited with her mother. Her luggage, which she had packed with belongings for a year-long stay in India, was never returned to her.

## III.

In 1996 Congress enacted the Antiterrorism and Effective Death Penalty Act which amended the FSIA to permit actions against foreign sovereigns in U.S. courts for money damages for personal injury or death caused by acts of, *inter alia*, hostage taking committed by officials, employees,

or agents of a foreign state against U.S. citizens. *See* 28 U.S.C. § 1605(a)(7). The FSIA adopts the definition of hostage taking used in the International Convention Against the Taking of Hostages, 34 U.N. GAOR Supp. No. 46, at 245 (TIAS 11081), which defines the offense, in pertinent part, as the seizure or detention of a person coupled with a threat to continue to detain that person "in order to compel a third party ... to do or abstain from doing any act as an explicit condition for the release of the hostage ...."

█ It is beyond dispute that the American citizens denied permission to leave Kuwait and Iraq from August through mid-December, 1990, by the armed forces and civilian police of the Republic of Iraq were "hostages" within the meaning of the FSIA, and entitled to maintain an action against Iraq for an appropriate award of money damages for the personal injuries they have suffered.[6]

█ The jurisprudence that has evolved under the 1996 amendments to the FSIA is relatively limited. For the most part it has involved sovereigns other than Iraq and isolated acts of extrajudicial killing or hostage taking rather than mass torts. And because all cases to date have proceeded to the merits by way of default, no appeals have been taken, and no federal circuit courts of appeal have addressed the legal issues. Nevertheless, certain principles have been articulated with some consistency by the districts courts having rendered judgments in such cases, and to the extent those principles can be discerned this Court will follow them.

For example, it has been held that federal common law, rather than the law of any other foreign or domestic U.S. jurisdiction, should govern in circumstances to which the FSIA does not speak. *See Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 14–15 (D.D.C.1998); *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27, 47 (D.D.C.2001); *Wagner v. Islamic Republic of Iran*, 2001 WL 1424312, at *3– *4 (D.D.C.2001). Likewise, recoverable elements of monetary damage have been declared, and a rudimentary calculus for computing them for individual claims has evolved. *See Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62, 70 (D.D.C.1998) (awarding damages at $10,000 *per diem* for false imprisonment, recurrent battery, and the mental anguish associated with inhumane conditions of confinement); *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 113–14 (D.D.C.2000) (same, but also awarding punitive damages); *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27, 37–40 (D.D.C.2001) (same, but also awarding punitive damages); *Daliberti v. Republic of Iraq*, 146 F.Supp.2d 19, 26–27 (D.D.C.2001) (similar). The Court will adopt those principles for purposes of this case to the extent they are apposite.

The essence of the tort of hostage taking is a false imprisonment, and the longer it lasts and the more onerous the conditions thereof, the greater the physical and psychic pain and suffering experienced by the victim while it persists. Added to that are the physical and psychic injuries that result from and endure after captivity has ceased. The Court finds that each of the plaintiffs have sustained compensable injury in both respects in this case. They were all exposed, to varying degrees, to

---

**6.** Two statutory formalities that are conditions precedent to suit have been satisfied: Iraq has been officially declared to be a state sponsor of terrorism as of September 1, 1990, *see* 28 U.S.C. § 1605(a)(7)(A); and Iraq has been offered an opportunity to arbitrate the claims arising in Iraq itself. *See id.*, § 1605(a)(7)(B). (*Dispatch* (U.S. Dept. of State 1990), Pl.Ex.2; Declar. of Daniel Wolf, Esq., of November 5, 2001.)

the same apprehensions, constraints, and privations at one time or another during their ordeals, with notably similar consequences, and no consistent basis has been shown (with exceptions to be noted) to distinguish between them.

They were kept against their will in Kuwait or Iraq and unable to move about freely in either country. They were denied means to communicate with the outside world. They remained in constant fear for their own lives (and in some cases for the lives of family and friends), and in perpetual uncertainty as to when, if ever, their captivity would end. They were deprived, for lesser or greater periods, of potable water, edible food, basic sanitation, changes of clothing, shelter from the climate, medicines and medical care, and habitable living conditions. Most were, at one time or another, subjected to or threatened with some physical brutality by their captors, and most were forced to witness atrocities committed upon others. Some developed treatable illnesses that were chronic while they remained in captivity: dysentery was the most common, but others included fungal infections, hemorrhoids and severe back pain. One plaintiff (Jack Frazier), deprived of daily medication for diabetes, experienced an acute, severe, and irreversible exacerbation of his condition that has progressed to loss of sight in one eye, and a peripheral neuropathy that has rendered him a cripple.

All of the plaintiffs lost personal possessions—some of considerable value—which were stolen, confiscated, abandoned or destroyed. And all of them manifest symptoms to this day of the experiences they endured.

Dr. Robert Blum, a Board-certified psychiatrist who has specialized, and has many years' experience, in the diagnosis and treatment of the post-release psychiatric problems of hostages and prisoners of war since 1974, related his findings with respect to each of the hostage-plaintiffs who testified at trial. Each suffers today from a chronic post-traumatic stress disorder of varying degrees of severity. They remain depressed, anxious, lethargic, moody, and are often irritable. They experience sudden flashbacks; are frequently insomniac; startle easily; have vivid nightmares; are sexually indifferent or actually impotent. Intimacy with others is difficult to achieve. They avoid any situation or experience, physical or mental, which is likely to revive recollections of their ordeals. Occasionally they also feel guilty, sometimes suicidal, for having survived the ordeal at all, or having done so more successfully than others may have done.

These residual psychic effects have altered their lives in myriad ways, not only with respect to the quality of their personal lives but also in relation to their livelihoods. In many cases they attribute work-related problems to their experiences as hostages, and their explanations are plausible. In the Court's opinion, however, the evidence is too speculative, and without a basis to exclude unrelated factors as causative of adverse fortunes in their working lives, to ascribe any quantity of monetary damages to their economic claims. Similarly, the evidence of the cost of any therapy they have had or might seek is too imprecise to quantify into damage awards.

The evidence is nevertheless clearly sufficient to entitle these plaintiffs to recover damages for false imprisonment, and the associated pain, suffering, and mental anguish engendered by the circumstances of their confinement; for the post-release psychic sequelae they have each manifested, now medically diagnosed as post-traumatic stress disorders; and

for the physical injuries shown to have been proximately caused by their ordeals. Although none were subjected to the extremes of brutality endured by the plaintiffs in such cases as *Cicippio, Anderson,* and *Daliberti,* their sufferings justify awards of between $3,000 and $5,000 per day of confinement, and lump sum awards of between $100,000 and $500,000 for their psychic injuries. Spouses who, by reason of absence from Iraq or Kuwait at the time, did not share in the actual captivity but nevertheless suffered it vicariously from afar, as well as the post-release consequences for their marriages, will be awarded sums between $100,000 and $300,000 for loss of consortium. Mr. Frazier is entitled to a judgment of $1 million for the exacerbation of his diabetic complications.

## IV.

Plaintiffs also ask the Court to award them punitive damages against Saddam Hussein. The FSIA exempts a foreign state from liability for punitive damages, *see* 28 U.S.C. § 1606, although an "agency" or "instrumentality" by which it commits acts of terrorism may be vulnerable to a punitive award. Saddam Hussein is alleged by plaintiffs to be such in relation to their captivity: It was initially ordered by Saddam Hussein, and it ceased only upon his command.

According to Ambassador Busby, Saddam Hussein, nominally the "president" of the "republic" of Iraq, is in reality a dictator of a one-party nation. He is chairman of the party, chief executive and prime minister, chair of the governing council, director of the budget, the exclusive appointing authority for all government offices, and, most importantly, the commander-in-chief of the armed forces. "Nothing happens with Iraq," according to Ambassador Busby, "that doesn't have Saddam

Hussein's okay." (Tr. of October 9, 2001, a.m., p. 17). In one sense Saddam Hussein is more *alter ego* than agent of Iraq, but it is also true that he acts for, and in the name of, the nation he rules and is thus sufficiently its instrumentality for the purpose of liability for punitive damages under the FSIA. If the purpose of punitive damages is to punish a wrongdoer and deter similar wrongdoing in the future, see *Anderson,* 90 F.Supp.2d at 114, then to the extent such an award against Saddam Hussein would be effective at all it would surely operate to like effect on Iraq.

The record does not contain evidence of Saddam Hussein's wealth, nor (as in other cases) the amount of Iraq's annual expenditures in support of its terrorist activities. Nevertheless, upon the premise that Iraq spends no less than Iran to that end, the Court will adopt the figure employed by the judges of this district court in cases against the Islamic Republic of Iran for comparable criminal behavior. All plaintiffs will, jointly and severally, share an award of $300 million against the defendant Saddam Hussein.

For the foregoing reasons, it is, this 5th day of December, 2001,

ORDERED, that the Clerk of Court forthwith enter judgment against the defendants Republic of Iraq and Saddam Hussein, jointly and severally, and in favor of the plaintiffs named below, for compensatory damages in the amounts specified as follows:

| | |
|---|---|
| Charles Joseph Kolb: | $ 945,000.00. |
| Apostolos Eliopoulos: | $1,160,000.00. |
| Angela Eliopoulos: | $ 250,000.00. |
| Bill Rodebush: | $ 900,000.00. |
| Taleb Nabil Subh: | $ 670,000.00. |
| Rev. Virgil M. Graham: | $1,150,000.00. |
| Laurie Graham: | $ 668,000.00. |
| Peter Graham: | $ 418,000.00. |
| Aaron Graham: | $ 168,000.00. |
| Jack Frazier: | $1,749,000.00. |
| David Morris: | $ 896,000.00. |
| Penelope Nabokov: | $ 136,000.00. |

IT IS FURTHER ORDERED, that the Clerk of Court forthwith enter judgments in favor of the aforesaid plaintiffs, jointly and severally, against the defendant Saddam Hussein, individually, for punitive damages in the amount of $300 million; *provided, however,* that payment of or execution upon the same is stayed pending proof of the claims of lately-joined coplaintiffs who may be entitled to share therein by way of declarations not yet evaluated by the Court; and it is

FURTHER ORDERED, that the record remain open until March 10, 2002, for the receipt of proof of the claims of all remaining plaintiffs, failing which their claims shall be dismissed without prejudice.