Dvir UNGAR, et al., Plaintiffs,

v.

The ISLAMIC REPUBLIC OF
IRAN, et al., Defendants.

No. CIV.A. 00–2606(JR).

United States District Court,
District of Columbia.

June 26, 2002.

David Strachman, McIntyre, Tate, Lynch & Holt, Providence, RI, for Plaintiffs.

## *MEMORANDUM OPINION*

ROBERTSON, District Judge.

Yaron Ungar and his wife Efrat were murdered in a terrorist machine gun attack on June 9, 1996, near Beit Shemesh, Israel. Five Palestinian men took part in the murders. Four of the five were apprehended and confessed to the Ungar murders and to other crimes. In this action, the Estate of Yaron Ungar and members of his family seek to recover compensatory and punitive damages arising from the murders.[1]

---

**1.** The plaintiffs are David Strachman, an American lawyer as administrator of the estates of both Yaron and Efrat Ungar; the parents of Yaron Ungar and Efrat Ungar su- ing on their own behalf and as guardians for the couple's children Yishai and Dvir, and Yaron Ungar's three siblings. Yaron Ungar was an American citizen. There has been no

The plaintiffs have sued the Islamic Republic of Iran, the Iranian Ministry of Information and Security (MOIS), and three Iranian government officials in this Court.[2] Foreign states and individual officeholders acting in their official capacities are ordinarily immune from suit in our courts, but there are exceptions. One of them, added to the Foreign Sovereign Immunities Act (FSIA) in 1996, is for claims arising out of state-sponsored terrorism.[3] The complaint in this case invokes that exception by alleging that the defendant Republic of Iran was and is a state sponsor of terrorism; that the other defendants were and are, respectively, an agency and officials of Iran; and that the murders of Yaron and Efrat Ungar were extrajudicial killings for which the defendants provided "material support or resources" within the meaning of 28 U.S.C. § 1605(a)(7). Complaint ¶¶ 8–12, 15–32. The defendants were served with process pursuant to 28 U.S.C. § 1608, none of them appeared to defend, and their defaults were entered on June 28, 2001. Plaintiffs then moved for a default judgment.

If a foreign state is not entitled to immunity on a claim, it will be held liable "in the same manner and to the same extent as a private individual under like circum-

stances." 28 U.S.C. § 1606. It may be held liable by *default*, however, only if the claimant "establishes his claim or right to relief by evidence satisfactory to the court." *Id.* § 1608(e).[4] For reasons set forth in a memorandum issued on January 4, 2002, I decided to bifurcate plaintiffs' motion for default judgment and to consider whether plaintiffs had produced satisfactory evidence of the defendants' liability before receiving proof of damages. An evidentiary hearing was set for January 15, 2002. Counsel was directed to focus on three specific questions: "What evidence is there of a causal link between Iran's support for Hamas and the specific attack in this case? What evidence is there of a relationship giving rise to respondeat superior liability? What is the evidence that supports the plaintiffs' civil conspiracy theory?" Memorandum of 1/4/02, at 8.

At the evidentiary hearing, plaintiffs presented documentary evidence and adduced the expert testimony of Ronni Shaked, a former Israeli security commander; Dr. Reuven Paz of the International Policy Institute for Counter–Terrorism in Israel; and Dr. Patrick Clawson of the Washington Institute for Near East Policy. After the hearing, plaintiffs were

---

proffer that Efrat Ungar was an American citizen, and the plaintiffs appear to concede that their claims based on her death must be dismissed. 28 U.S.C. § 1605(a)(7); *id.* § 1605 Note; *Alejandre v. Republic of Cuba,* 996 F.Supp. 1239, 1248 n. 5 (S.D.Fla.1997).

**2.** They have sued HAMAS, the Palestinian Liberation Organization, and the Palestinian Authority in the District of Rhode Island. *Estates of Ungar ex rel. Strachman v. Palestinian Auth.,* 153 F.Supp.2d 76 (D.R.I.2001).

**3.** The FSIA was amended twice in 1996. Section 1605(a)(7) was enacted in April 1996, before the Ungar murders, and was made applicable to causes of action arising both before and after its passage. Pub.L. No. 104–132, Title II, § 221, 110 Stat. 1214, 1241–43

(April 24, 1996). Section 1605 Note, often called the Flatow Amendment, was enacted in September 1996. Pub.L. No. 104–208, Div. A, Title I, 110 Stat. 3009–172 (Sept. 30, 1996). The two amendments are construed *in pari materia,* and the later amendment relates back to the earlier one. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12–14 (D.D.C.1998).

**4.** This provision mirrors the standard applicable to default judgments against the United States. Fed.R.Civ.P. 55(e). MOIS and the three individual defendants are treated for this purpose as agencies or instrumentalities of the government of Iran. *El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 671 (D.C.Cir. 1996); *Flatow,* 999 F.Supp. at 26.

directed to file English translations of the confessions upon which the expert witnesses, especially Mr. Shaked, relied. Those translations were filed on April 3, 2002.

### Findings of Fact

The findings set forth below that deal with Iran's status as a state sponsor of terrorism and with the relationship between Iran and HAMAS are similar to findings made by other judges of this Court in other cases seeking damages for HAMAS attacks from Iran, her agencies, and officials. *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13 (D.D.C.2002); *Mousa v. Islamic Republic of Iran*, Civ. No. 00–2096 (D.D.C. Sept. 19, 2001); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (D.D.C.2000).

1. At the time of its revolution in 1979, Iran adopted a formal policy of supporting Islamic-based revolutionary organizations throughout the Middle East. Tr. 1/15/02 at 21–22. Harakat Al–Muqawama Al–Islamiyya (HAMAS) is one of those organizations. An outgrowth of the Muslim Brotherhood movement, HAMAS was founded in 1987 to pursue the creation of an Islamic state, first in Palestine and then throughout the Middle East. HAMAS is a Sunni Muslim organization and was at first highly suspicious of Iran's Shiite regime. As the Palestinian Liberation Organization and Israel began to negotiate a peaceful settlement of Palestinian claims after the Gulf War, however, HAMAS and Iran grew closer until they had formed what the witnesses called a "partnership." *Id.* at 17–23, 65–68, 92–93, 97–100. The relationship between HAMAS and Iran was described using an established Israeli metaphor:

> Your Honor, it is like a cow. On the one hand the cow wants to give milk. That's Iran. And on the other hand, Hamas wants to drink the milk. . . . Iran wanted to export its revolution. Hamas wanted to get weapons, to get money, to get facilities for to train the people; and the only place that they can do it, it is in Iran.

1/15/02 Tr. at 22–23; *see also id.* at 70–71. By the mid 1990s, Iran and HAMAS were cooperating for purposes of jihad, or violent struggle, specifically to disrupt the Israel–PLO peace process. *Id.* at 19–21, 23, 98; Pl.Ex. 63.

2. Iran provided HAMAS with tens of millions of dollars, weapons and explosives, terrorism training, and other assistance through MOIS [5] and through Hizbollah, its agent in Lebanon. [6] Tr. 1/15/02 at 25–34, 70–72, 79–82, 86–88, 98–100. Several hundred HAMAS members are believed to have received intensive terrorism training in Iran. *Id.* at 28–29, 34, 69. This cadre—unlike the larger number of frontline HAMAS fighters given short-term training in Lebanese Hizbollah camps—was trained to

---

5. MOIS is the successor to the Shah's secret police force and employs approximately 30,000 people across the Middle East. It appears to be the primary liaison between the Iranian government and Palestinian organizations. MOIS' annual budget is estimated at $50 million to $100 million. Tr. 1/15/02 at 102–03.

6. Unlike HAMAS, Hizbollah was actually created by Iran to further its interests in Lebanon. Tr. 1/15/02 at 30–31, 82. Because it exercises substantial control and approval authority over the group, Iran has repeatedly been held liable under FSIA for Hizbollah's hostage taking and other activities. *See, e.g., Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78 (D.D.C.2002); *Wagner v. Islamic Republic of Iran*, 172 F.Supp.2d 128 (D.D.C.2001); *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27 (D.D.C.2001); *Higgins v. Islamic Republic of Iran*, No. 99–377, 2000 WL 33674311 (D.D.C. Sept. 21, 2000); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62 (D.D.C.1998).

be leaders and to provide further training within HAMAS. *Id.* at 32, 72.

3. Relations between Iran and HAMAS were particularly close in 1996, the year of the Ungar murders and the year in which Iran was designated by the United States Department of State as "the" premier state sponsor of terrorism. Pl.Ex. 29, Overview of State Sponsored Terrorism at 2. HAMAS claimed responsibility for four suicide bombings in February and March 1996. After the first two of them, Iran sent its vice-president to meet with HAMAS leaders and to praise them publicly. *Id.* Iran is also believed to have provided cash payments to HAMAS and to the families of suicide bombers as a means of encouraging HAMAS' opposition to the peace process. Tr. 1/15/02 at 98–101. The HAMAS bombings precipitated early elections in Israel and were largely credited with undermining public confidence in Prime Minister Shimon Peres, who lost to the more hard-line Benjamin Netanyahu in May 1996. Pl.Ex. 29, Introduction at 1; Tr. 1/15/02 at 105.

4. Beginning in March 1996, HAMAS tactics shifted away from suicide bombings and focused instead on kidnaping soldiers and attacking with machine guns from moving vehicles. Tr. 1/15/02 at 75. Plaintiffs' experts placed particular emphasis on the difficulty of hitting targets while firing machine guns from moving vehicles and asserted that only Iranian-trained HAMAS members—or HAMAS members trained by Iranian-trained HAMAS members—could do it. *Id.* at 28–29, 47–48, 75–76. The Ungars were attacked, with Kalashnikov machine guns, from a moving vehicle. Mr. Shaked characterized the attack as "a perfect example of the Iranian—what we call contribution to Hamas," emphasizing the need, when shooting from a moving vehicle, to "shoot before, a little bit before the car, not into the car." *Id.* at 47–48.

The confessions of the attackers, however, make it clear that their car was overtaking, not meeting, the Ungar's car. Confessions at 5, 89.

5. The link between the Iranian defendants and the Ungar murders, in the opinion of plaintiffs' experts, was in the connections between and among Abdel Rahman Ismail Abdel Rahman Ghanimat (Ghanimat), Nasser Salah Talachmeh (Talachmeh), and Hassan Salame (Salame). Ghanimat was the leader of the group that carried out the attack and one of the shooters from the attacking car. The experts testified that Ghanimat's group was ineffective (as terrorists) until sometime in late 1995, when Ghanimat hooked up with Talachmeh, who was characterized (by plaintiff's counsel) as a "proper HAMAS commander." Tr. 1/15/02 at 53–54, 78–79. The experts said that Talachmeh became Ghanimat's "handler" and provided him with a Kalashnikov automatic rifle. *Id.* at 53–54, 78.

6. The experts thought it more likely than not that Talachmeh also arranged for Ghanimat and perhaps other members of the group to obtain training from Salame, an "arch-terrorist" who had himself been trained for four months in Iran, *id.* at 56, 72, was an "expert in using weapon[s] and explosive[s]," and was "[m]ore than an adviser" to Talachmeh: "He was the man that gave him the way how to do and what to do." *Id.* at 59. However, because HAMAS trainers are hooded and masked, the experts stated that there was no way to determine Salame's identity for sure.

[Mr. Shaked:] [W]e don't know exactly if [Salame] trained only Ghanimat or the other one from the cell that we are talking about because when they get an order to go and be trained, you know as a modus operandi, they were masked and I'm sure again when we are talking about a terrorist organization and talk-

ing about Hamas, somebody from a higher rank has to show and to train other people; and in 1996, not so many people, good train—like Hassan Salame.

Q. But was he the trainer for this—for Mr. Talachmeh's group?

A. I don't say—I can't say exactly if he was the man, but according to the modus operandi, and according to what we can—we know the structure of Hamas, and the way that they behave, I can say that he was the man. Not others. Because we don't know exactly who was that. If because the people who were there, the people who gave—we're talking about the—the man who trained them, we—they said we didn't know who was this man.

*Id.* at 60–61.

Q. Was he—was Salame the trainer for the Talachmeh cell?

[Dr. Paz:] I don't know for sure. But it is probably—since he confessed that he trained most of the Hamas members in that region at that time, and since he was the main trainer of Hamas at that time in this region, it is very probably, I can say, that he was the trainer of the Talachmeh cell.

Q. Is there anyone else that you know of who could have or would have done the training for the cell that killed the Ungars? Is there anyone else who has been identified as a trainer of that cell?

A. No. Not that I know of. And if I may add we are talking here in this case—we are not talking about explosives, but we are talking about kidnaping and shooting from moving cars which in no other members of Hamas besides those who were trained in Iran

actually were trained in such methods of operation.

So it is very likely that he was the guy who trained the Talachmeh cell; although they didn't know—the trainer was masked. They didn't know him by name. And they didn't know him at all; and actually, he was also—he was not from that region. He was from the Gaza Strip; so he wasn't known by local people.

*Id.* at 75–76. Salame was later convicted in the Israeli courts of training people in machine gun use from March 1996 to May 1996. Tr. 1/15/02 at 62.[7]

7. The experts' opinions that Salame probably trained the men who murdered the Ungars are not supported by the confessions of the murderers. Both Ghanimat and Jamal Al–Hor stated that Ghanimat's group had no contact with HAMAS leadership while Talachmeh was in prison between January/February 1996 and July to October 1996, when Ghanimat reestablished contact by asking him for money. Conf. at 4–6, 93–94. The confessions make no reference to instruction on shooting from moving cars. *See, e.g.,* Conf. at 2 (Ghanimat received training from a group member sometime prior to an arrest in 1993 on how to assemble and disassemble a Galil and to fire a Canadian rifle); *id.* at 40, 56, 88 (group members engaged in shooting practice among themselves); *id.* at 8 (Ghanimat and other group members undertook "shooting practice" with an Uzi Ghanimat received from his new contact in 1997); *id.* at 8, 71–73 (Iman Kafishe was trained in how to make and detonate remote-control explosives by a hooded and masked man in 1997). In their proposed findings of fact, plaintiffs cite to testimony

---

7. Salame was also involved in the bombing of a passenger bus that was the subject of *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C.2002), *Mousa v. Islamic*

*Republic of Iran,* Civ. No. 00–2096 (D.D.C. Sept. 19, 2001), and *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1 (D.D.C.2000).

that Ghanimat, Al–Hor, and Kafishe met on a mountain to practice shooting a Kalashnikov that they had purchased. A fourth man was present, wearing a mask, but he was a new recruit, Talab Abu Sneina. Kafishe had met Sneina in prison and asked him to assist in purchasing the new guns. The "training," as described by Al–Hor, consisted of Ghanimat and Sneina firing one of the guns a number of times, apparently to make sure that it was of good quality. The participants were masked so that Sneina would not recognize Ghanimat or Al–Hor. *Id.* at 4, 68–70, 87.

8. The confessions also indicate that, while members of Ghanimat's group did consider themselves members of HAMAS, their affiliation with HAMAS was quite loose. Thus, although HAMAS leadership may have decided in the spring of 1996 to change tactics from suicide bombs to shootings and kidnapings, Ghanimat's group appears to have focused on car attacks from at least December 1995 onward. *Id.* at 4–5. And, although the group began timing attacks, using explosives, and selecting targets as directed by a HAMAS handler in 1997, *id.* at 7–9, 24–25, in the 1995–96 period Ghanimat appears to have acknowledged his group's attacks to Talachmeh only after the fact and to have chosen his operations without receiving instructions from HAMAS, *id.* at 4–5. The confessions are also in some conflict as to how much of the group's money and weapons came from Talachmeh. It is clear that, to some extent, they supported their operations and purchased guns using means independent of HAMAS, including at least part of the funds used to purchase the second Kalashnikov. *Id.* at 3, 69–70, 87.

9. Accepting all of the documentary evidence and expert testimony adduced by the plaintiffs as true, and accepting the confession statements of Ghanimat's group as true notwithstanding suggestions that some of them may have been coerced, Pl.Ex. 3 at 2, the most that is clearly established by the record is (a) that Iran was at all relevant times a state sponsor of terrorism, (b) that the other defendants were agents or instrumentalities of Iran, and (c) that the defendants gave money and weapons to HAMAS and trained some HAMAS members in order to encourage HAMAS in its terrorist activities.

### Conclusions of Law

1. *Plaintiffs have properly invoked the subject matter jurisdiction of this Court and the Court's personal jurisdiction over the defendants.*

Iran has been designated by the United States Government as a state sponsor of terrorism since 1984. The 1996 murders of the Ungars were extrajudicial killings. Iran and MOIS (at least) provided "material support or resources" to HAMAS under 28 U.S.C. § 1605(a)(7) and 18 U.S.C. § 2339A, which defines the term as including "currency ..., training, expert advice or assistance, ... false documentation ·or identification, ... [and] weapons." Thus, the allegations of the complaint properly *invoke* the personal and subject matter jurisdiction of this Court under the Foreign Sovereign Immunity Act. 28 U.S.C. § 1605(a)(7); *id.* § 1330(b); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 19–23 (D.D.C.1998).

*Flatow* held that "a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises in order to satisfy 28 U.S.C. § 1605(a)(7)'s statutory requirements for subject matter jurisdiction. Sponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient to invoke jurisdiction." 999 F.Supp. at 18. That holding sidesteps the causa-

tion question that lies at the center of the instant case. The language of the statute provides that federal courts shall have jurisdiction over suits "for personal injury or death that was *caused* by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee or agent" of a state sponsor of terrorism acting in their official capacity. 28 U.S.C. § 1605(a)(7) (emphasis added). Whether the *absence* of causation is a jurisdictional issue or a liability issue has not been decided by an appellate court and need not be decided here. I have assumed that plaintiffs' *allegations* of causation are sufficient to invoke the jurisdiction of this Court. For the reasons set forth in my earlier memorandum, Memorandum of 1/4/02, at 7–8, however, I have followed the reasoning of *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27, 47–48 (D.D.C.2001), in separating the immunity analysis from the liability analysis.

2. *"[E]vidence satisfactory to the court," 28 U.S.C. § 1608(e), is evidence that would withstand a motion for judgment as a matter of law made pursuant to Fed.R.Civ.P. 50(a).*

■ A threshold question in this case is how to apply the "evidence satisfactory to the court" language of 28 U.S.C. § 1608(e). There is very little case law on the subject. Several decisions by other judges of this Court involving state-sponsored terrorism under the FSIA have applied a "clear and convincing evidence" test, *see, e.g., Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 16 (D.D.C.2002); *Mousa v. Islamic Republic of Iran*, Civ. No. 00–2096, at 2 (D.D.C. Sept. 19, 2001); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 4, 8 (D.D.C.2000), but the evidence in those cases appears indeed to have been clear and convincing. Other decisions have required "satisfactory evidence as to each element of the [plaintiffs'] claims," *Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir.1996), a formulation that is not helpful here, and "evidence of a nature and quality to support summary judgment," *Hill v. Republic of Iraq*, 175 F.Supp.2d 36, 38 n. 4 (D.D.C.2001), which, freely translated in the context of default, means a legally sufficient prima facie case. I believe that the correct standard—and the one I am applying in this case—is the standard for granting judgment as a matter of law under Fed.R.Civ.P. 50(a)—a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff.[8]

3. *Plaintiffs have not established a legally sufficient evidentiary basis for a reasonable jury to find that the acts of the defendants were a necessary condition or "but for" cause of the Ungars' deaths.* See Restatement (Second) of Torts § 432 (1965); Restatement (Third) of Torts § 26 (Tentative Draft No. 2, Mar. 25, 2002).

■ Plaintiffs' evidence for the proposition that Iran's support for terrorism caused the murders of Yaron and Efrat

---

8. Another potential threshold question is what law to apply. The FSIA generally requires the application of state law principles to determine liability, *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 620–22 n. 11, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). In deciding state-sponsored terrorism cases, however, judges of this Court have looked to federal common law.

*See, e.g., Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 86–87 (D.D.C.2002); *Wagner v. Islamic Republic of Iran*, 172 F.Supp.2d 128, 134–35 (D.D.C.2001); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 14–15 (D.D.C.1998). There is no significant difference between District of Columbia and federal common law on the causation and vicarious liability issues presented by this case.

Ungar is more attenuated than that presented in any previous § 1605(a)(7) case of which I am aware. In *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 19–22 (D.D.C.2002), *Mousa v. Islamic Republic of Iran*, Civ. No. 00–2096, at 5, 18 (D.D.C. Sept. 19, 2001), and *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 5–8 (D.D.C.2000), HAMAS members who bombed a bus were themselves trained on the use of explosives in Iran or by Iranian officials, and the Court concluded that the Iranian support was a but-for cause of the attacks. In *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 9 (D.D.C.1998), Iran was shown to have been the sole funding source of the terrorist organization that carried out the attack. In *Higgins v. Islamic Republic of Iran*, No. 99–00377, 2000 WL 33674311 at *9–13 (D.D.C. Sept. 21, 2000), and *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62, 68 (D.D.C.1998), Iranian officials were shown to have had approval authority or total control over hostage taking by Hizbollah, its agent in Lebanon.

Here, plaintiffs have established that Iran provided extensive support to HAMAS, but their proof does not link that support to the Ungar murders specifically. The men who killed Yaron and Efrat Ungar received funding and weapons from other sources as well as HAMAS, they were not in contact with HAMAS for several months spanning the date of the Ungar murders, and their confessions do not support the experts' opinions that the attack was a "perfect example" of what Iranian training could accomplish. Except for the experts' opinions, indeed, there is no record support for the proposition that Ghanimat and his men received any training from HAMAS members in the spring of 1996 or that they ever received specialized training in shooting from moving cars.

■ 4. *Plaintiffs have not established a legally sufficient evidentiary basis for a reasonable jury to find the defendants liable for the Ungars' deaths on either of the joint tort theories they advance.* Plaintiffs rely heavily on the leading case of *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir. 1983), in which Judge Wald carefully explained and parsed two "joint tort" theories, aiding and abetting and civil conspiracy. *Halberstam* was an action for wrongful death against Welch, a burglar who shot and killed one of his victims, and Welch's live-in girlfriend. The girlfriend knew of Welch's activities and helped him dispose of stolen goods and manage his finances, but she did not assist in the killing or in any of the break-ins. The court concluded that the girlfriend was liable both as a co-conspirator and as a "joint venturer" who aided and abetted the burglaries. Its opinion emphasized the importance of analyzing each theory separately, because conspiracy hinges upon proof of an *"agreement to participate"* in tortious conduct, while aiding and abetting requires proof of *"knowing action that substantially aids"* tortious conduct. *Id.* at 478 (emphasis in original).

■ (a) *Plaintiffs have not established that defendants knowingly and substantially assisted in the Ungar murders.* Civil liability for aiding and abetting requires proof of (1) a wrongful act causing an injury by a party aided by the defendant; (2) the defendant's knowledge of his role as part of an overall illegal or tortious activity at the time that he provided assistance; and (3) the defendant's knowing and substantial assistance in the principal violation. *Id.* at 477. For the reasons discussed above, however, the plaintiffs have not shown that the "knowing and substantial assistance" of Iran extended to the "principal violation"—the attack on the Ungars.

■ (b) *Plaintiffs have not established that the Ungars' murderers were co-conspirators with the defendants.* A claim of civil conspiracy is established by proof of (1) an agreement between two or more persons; (2) to participate in an unlawful or tortious act; and (3) an injury caused by an unlawful or tortious overt act performed by one of the parties; (4) which was done pursuant to and in furtherance of the common scheme. *Id.* Conspirators may be held liable for acts committed by other co-conspirators if the acts are within the scope of the agreement, are done in furtherance of the conspiracy, and are reasonably foreseeable. *Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Halberstam,* 705 F.2d at 487.

■ Conspiracy analysis focuses on the agreement and does not require proof of "knowing and substantial assistance" to any particular act, as aiding and abetting analysis does. However, conspiracy does require proof of a "common and unlawful plan whose goals are known to all members," even if all parties are not privy to each individual act taken in furtherance of the common objective. *Hobson v. Wilson,* 737 F.2d 1, 55 (D.C.Cir.1984), *overruled in part on other grounds, Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Because conspiracies must generally be inferred from indirect evidence, courts must "initially look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another." *Halberstam,* 705 F.2d at 481. To demonstrate the existence of a "chain" conspiracy in which conspirators are not all directly connected, the critical question is whether each conspirator knows of the existence of the larger conspiracy and of the necessity

for the other participants even if he or she does not know their identities. More broadly, courts focus on whether the parties share a common goal, the degree of interdependence between the alleged participants, and any overlap between participants among the various operations alleged to comprise a single conspiracy. *United States v. Tarantino,* 846 F.2d 1384, 1392–93 (D.C.Cir.1988); *see also United States v. Townsend,* 924 F.2d 1385, 1392 (7th Cir.1991) ("to be liable as coconspirators, defendants must be mutually dependent on one another").

The absence of a clear link from the Iran–HAMAS "partnership" to Ghanimat and his group is fatal to plaintiffs' conspiracy theory. There is no proof that the murderers knew of or agreed to participate in a "common and unlawful plan whose goals [were] known to all members"; or that the Ghanimat group, allegedly at the end of a long "chain" conspiracy, knew of the existence of the larger conspiracy; or that the Ghanimat group knew of the necessity of the other alleged co-conspirators or were in fact dependent upon them. No reasonable juror could find the defendants liable on a conspiracy theory without speculating about matters that have not been established in this record—that Ghanimat and his group had guilty knowledge of the Iran–HAMAS partnership and that they understood and shared its alleged goal of disrupting the Israel–PLO peace process.

### Conclusion

The order that accompanies this memorandum denies plaintiffs' motion. Such a denial is without prejudice and is not, of course, a judgment on the merits of the plaintiffs' claims. If plaintiffs have, or acquire, further evidence of Iran's liability for the Ungar murders, they may renew their motion. Alternatively, if plaintiffs wish to seek appellate review, a motion to

certify under 28 U.S.C. § 1292(b) would be favorably considered. Most of the cases involving the provision of material support or resources to terrorists under 28 U.S.C. § 1605(a)(7) have involved defaulting defendants, and appellate courts have not yet had an opportunity to review the standards being used by district judges to analyze the liability of state sponsors of terrorism, or to consider the proper role of causation in analyzing a specific factual record. *Cf. Boim v. Quranic Literacy Inst.*, 127 F.Supp.2d 1002 (N.D.Ill.2001), *aff'd* 291 F.3d 1000 (7th Cir.2002) (discussing the liability of private groups providing material support or resources to terrorist organizations under 18 U.S.C. § 2333 upon defendants' motion to dismiss). Nor, given the paucity of law on "joint torts" in this Circuit, is the application of civil conspiracy law to the facts of the case well settled.

## *ORDER*

For the reasons set forth in the accompanying memorandum opinion, it is this _____ day of June 2002

**ORDERED** that plaintiffs' motion for default judgment [# 10] is **denied**. And it is

**FURTHER ORDERED** that plaintiffs' motion to schedule hearing on damages [# 31] is **denied**.