Raymond Anthony SMITH, as Administrator of the Estate of George Eric Smith, deceased; and Katherine Soulas, in her own right, on behalf of her minor children, and as Executrix of the Estate of Timothy Soulas, deceased, Plaintiffs,

v.

The ISLAMIC EMIRATE OF AFGHANISTAN, The Taliban, Al Qaida/Islamic Army, Shiekh Usamah Bin–Muhammad Bin–Laden a/k/a Osama Bin Laden, Saddam Hussein, The Republic of Iraq, Defendants.

No. 01 CIV. 10132(HB).

United States District Court,
S.D. New York.

May 7, 2003.

As Amended May 16, 2003.

### OPINION AND ORDER

BAER, District Judge.

## I. BACKGROUND

On November 14, 2001, Raymond Anthony Smith, the administrator of the estate of his brother George Eric Smith, brought suit against the Islamic Emirate of Afghanistan, the Taliban, al Qaeda, and Sheikh Usamah Bin Muhammad Bin Laden also known as Osama bin Laden, seeking damages for George Smith's death in the events of Sept. 11, 2001. On November 15, 2001, Jane Doe,[1] executrix of the estate of Timothy Soulas, brought a separate suit against these same defendants. Plaintiffs effected service on the Taliban and the Islamic Emirate of Afghanistan through personal service on Ambassador Abdul Salaam Zaeef and on the other defendants through service by publication in Afghani and Pakistani newspapers and several television stations.[2] I concluded that this service met minimal due process requirements. By order of January 23,

2003, the Court consolidated the two cases, designating *Smith v. Islamic Emirate of Afghanistan,* 01 Civ. 10132, as the lead case.

With the Court's permission, plaintiffs amended the consolidated complaint on June 10, 2002, to add Saddam Hussein and the Republic of Iraq as defendants. The summons and complaint was served upon the Republic of Iraq via the U.S. State Department's Director of Special Consular Services, U.S. Department of State, who in turn transmitted the documents to the Ministry of Foreign Affairs of the Republic of Iraq. None of the defendants has appeared and consequently the Court granted a default judgment against Saddam Hussein on February 21, 2003, and against all other defendants (including Iraq) on December 23, 2002. I held an inquest on February 28, 2003.

The lawsuit evolved from the extraordinary events of September 11, 2001. Not surprisingly, it raises several novel issues of law, including some of first impression.

## II. LIABILITY

### A. Al Qaeda defendants

 Plaintiffs are proceeding against the non-sovereign defendants—*i.e.,* the "al Qaeda defendants"[3]—under traditional tort principles and pursuant to the Antiterrorism Act of 1991 ("the ATA"), which provides that "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor

---

1. Subsequently, the complaint was amended to name Mr. Soulas' wife, Katherine Soulas, as the executrix of his will. *See* Letter from James E. Beasley to Judge Harold Baer, Jr., 2 (Mar. 5, 2003).

2. Service was effected on bin Laden through publication on six successive weekends in March and April 2002 in the Afghani newspapers Hewad, Anis, Kabul News, and Kabul Times, and in the Pakistani newspaper Wahat. In addition, plaintiffs broadcast notices on the Al Jazeera television network, Turkish CNN, BBC World, ARN, and ADF.

3. Osama bin Laden, al Qaeda, Taliban, and Islamic Emirate of Afghanistan.

in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333.

As an initial matter, it is not self-evident that the events of September 11 fall within the statute's definition of "international terrorism." Specifically, the statute defines "international terrorism" in contradistinction to "domestic terrorism."[4] The main difference is that domestic terrorism involves acts that "occur primarily within the territorial jurisdiction of the United States," while international terrorism involves acts that "occur primarily outside the territorial jurisdiction of the United States, or transcend[s] national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the lo-cale in which their perpetrators operate or seek asylum." The acts of September 11 clearly "occurred primarily" in the United States—indeed, they occurred entirely in the United States: airplanes owned and operated by U.S. carriers took off from U.S. airports and were in route to U.S. destinations when they were hijacked and crashed into U.S. landmarks. However, acts of international terrorism also encompass acts that "transcend national boundaries in terms of the means by which they are accomplished ... or the locale in which their perpetrators operate." Arguably, this broad provision includes the case at bar, which was carried out by foreign nationals who apparently received their orders and funding and some training from foreign sources.[5] Although mindful that an expansive interpretation of "international terrorism" might render "domestic

4. The definitions in their entirety are as follows:
 (1) the term "international terrorism" means activities that-
 (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
 (B) appear to be intended—
 (i) to intimidate or coerce a civilian population;
 (ii) to influence the policy of a government by intimidation or coercion; or
 (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
 (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;
 . . .
 (5) the term "domestic terrorism" means activities that—
 (A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;
 (B) appear to be intended—

(i) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or coercion; or
(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
(C) occur primarily within the territorial jurisdiction of the United States.
18 U.S.C. § 2331.

5. The seminal case construing § 2333, *Boim v. Quranic Literacy Institute,* 291 F.3d 1000 (7th Cir.2002), is generally unhelpful in this respect because it squarely fell within § 2331's definition of "international terrorism." In *Boim,* the parents of a 17–year–old U.S. citizen killed in a drive-by shooting in Israel by known members of the military wing of Hamas sued several charities that allegedly operated in the United States and collected money to support Hamas' terrorist activities. *See Boim,* 291 F.3d at 1002. *Boim* thus unquestionably satisfied the three elements of the definition, including that it "occur[red] primarily outside the territorial jurisdiction of the United States."

terrorism" superfluous, I conclude that these facts fall within the statute's definition of "international terrorism" and thus plaintiffs have pled a valid cause of action against the al Qaeda defendants.

### 1. Default under Fed.R.Civ.P. 55

■ In general, a default judgment establishes the defendant's liability. *See, e.g., Cablevision Systems v. Radienovic,* 2002 U.S. Dist Lexis 16604, *8–9 (S.D.N.Y. Aug. 28, 2002). Accordingly, the failure of the al Qaeda defendants to appear concludes the liability phase as against them and only a determination of damages remains. *See Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65–66 (2d Cir.1981). Although not necessary for liability, nevertheless the plaintiffs offered evidence of Osama bin Laden's involvement in terrorism in general and in the hijackings of the planes that hit and destroyed the World Trade Center on September 11th. In addition to the videotape in which bin Laden relates to a cleric how he planned to destroy the World Trade Center, plaintiffs pointed to bin Laden's *fatwah,* or holy war, of February 23, 1998, against the United States as well as other acts of terrorism against the United States linked or attributed to bin Laden, including the bombing of the Khobar Towers in Dhahran, Saudi Arabia, in June 1996; the bombings of the U.S. embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya in August 1998; and the bombing of the USS Cole in Yemen in October 2000.

### B. The Iraqi defendants

#### 1. Default under 28 U.S.C. § 1608(e): "Evidence satisfactory to the court"

##### a) Standard of proof required against the Iraqi defendants

■ The Foreign Sovereign Immunities Act provides that: "No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, *unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.*" 28 U.S.C. § 1608(e) (emphasis added). This standard is identical to the standard for defaults against the United States, Fed. R.Civ.P. 55(e). *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2d Cir.1994). Plaintiffs argue that this standard is "less than normally required." *Alameda v. Secretary of Health, Education & Welfare,* 622 F.2d 1044, 1048 (1st Cir.1980).

I have not found nor have plaintiffs cited any Second Circuit opinion that expressly decides what "evidence satisfactory to the court" means, in the context either of Rule 55(e) or § 1608(e). Instead, plaintiffs refer to *dicta* which, they suggest, indicate that this circuit adopts the less-than-normally-required standard articulated by the First Circuit in *Alameda.* For example, in *Marziliano v. Heckler,* 728 F.2d 151 (2d Cir.1984), the Second Circuit noted with favor the First Circuit's *Alameda* standard. *See Marziliano,* 728 F.2d at 158 ("Indeed, it has been suggested in the context of this rule that 'the quantum and quality of evidence that might satisfy a court can be less than that normally required.'" (quoting *Alameda* )). However, the *Marziliano* court also stated that "[o]n the record before us, there is no basis for concluding that the district court was not satisfied with the proof before it, which was of the quantum and quality it would ordinarily receive." *Marziliano,* 728 F.2d at 158. Further, the only other decision from the Second Circuit on the meaning of "evidence satisfactory to the court" omits reference to *Alameda* and provides no further explication of this standard. *See Rafidain Bank,* 15 F.3d at 242. Finally, even if the Court adopts this less-than-normally-required standard, it begs the question

of normally required *when*—at an inquest, on the pleadings, at summary judgment, or after a full adversarial proceeding.

The issue appears to have defied definitive resolution largely because in most cases the evidence of the defaulting defendant's liability is quite compelling and thus the matter can be decided without a more concise meaning of "evidence satisfactory to the court." *See, e.g., Marziliano*, 728 F.2d at 158; *Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222, 224 (D.D.C.2002) (finding that the facts were established by "clear and convincing evidence, which would have been sufficient to establish a prima-facie case in a contested proceeding"). Nevertheless, two competing views have remerged from the District Court of the District of Columbia, where many § 1608(e) cases are litigated: Several courts have applied—or invoked—a clear-and-convincing-evidence standard. *See Ungar v. Islamic Republic of Iran*, 211 F.Supp.2d 91, 98 (D.D.C.2002) (citing *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 16 (D.D.C.2002); *Mousa v. Islamic Republic of Iran*, 238 F.Supp.2d 1, 3 (D.D.C. 2001); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 4, 8 (D.D.C.2000)). However, the court in *Ungar v. Islamic Republic of Iran* concluded that the proper standard in the context of a default was "the standard for granting judgment as a matter of law under Fed. R.Civ.P. 50(a)—a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *See Ungar*, 211 F.Supp.2d at 98 (citing *Hill v. Republic of Iraq*, 175 F.Supp.2d 36, 38 n. 4 (D.D.C.2001)).[6] (The *Ungar* court did not cite *Alameda* and *Marziliano* and instead noted the dearth of case law on the meaning of "evidence satisfactory to the court.")

Plaintiffs make two strong policy-based arguments for why a lesser standard, such as the one espoused in *Ungar* or in *Alameda*, is appropriate. One of the reasons behind Rule 55 and § 1608 is to protect the public treasury from slow-moving sovereigns—a factor certainly not present here. *See Rafidain Bank*, 15 F.3d at 242 (quoting *Marziliano* ). Furthermore, if "to the satisfaction of the court" imposes a heavy burden of proof, then sovereigns may be encouraged to default because they can avoid participating in discovery with little down side.[7] However, the plaintiffs in the cases discussed *supra* have apparently not been prejudiced by the lack of access to discovery, nor have the plaintiffs in this most extraordinary case. The matters which plaintiffs seek to prove are

---

**6.** The *Hill* court stated: "In the circumstances the Court interprets the requirement to call for proof by evidence of a nature and quality sufficient to support summary judgment under Fed.R.Civ.P. 56, namely, oral or written testimony under oath, made upon personal knowledge by witnesses competent to testify to the matters stated therein." *Hill*, 175 F.Supp.2d at 38 n. 4.

**7.** Plaintiffs cite *Ohntrup v. Makina ve Kimya Endustrisi Kurumu*, No. 76–742, 1993 WL 315636, 1993 U.S. Dist. LEXIS 13496 (E.D.Pa. Aug. 18, 1993), for the following:

Courts interpreting Rule 55(e) of the Federal Rules of Civil Procedure, which restricts default judgments against the United States in terms identical to those contained in

section 1608(e), . . . have consistently stated that in a default judgment proceeding against the government, the quantum and quality of evidence that might satisfy a court can be less than that normally required. To conclude otherwise would have the effect of rewarding foreign governments for shirking their internationally recognized duty to defend properly filed cases.

*Ohntrup*, 1993 WL 315636, 1993 U.S. Dist. LEXIS 13496, at *13–*14 (footnote and citations omitted). However, *Ohntrup* also stated that "evidence satisfactory to the court . . . implicitly means that plaintiffs may not rely on the uncontroverted allegations of the complaint to establish their right to relief." *Ohntrup*, 1993 WL 315636, 1993 U.S. Dist. LEXIS 13496, at *8 n. 3.

identical to those that our government has sought to uncover and prove. However strong the engine of discovery for uncovering the truth may be, it pales in comparison to the combined resources of the United States law enforcement, military, and intelligence agencies, who have bent every effort to make the case that Saddam Hussein was involved in the September 11 attacks.

However, there is a second side to this policy coin—namely the government's interest in comity and reciprocity. *Cf. Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C.Cir.2002) (discussing the competing considerations with respect to the repeal of sovereign immunity for state-sponsors of terrorism and noting "[e]xecutive branch officials feared that the proposed amendment to FSIA might cause other nations to respond in kind, thus potentially subjecting the American government to suits in foreign countries for actions taken in the United States").

Although Congress intended a heavier burden than the generally accepted burden where the defendant has defaulted, it is not clear how much higher a burden it intended. The reasoning of *Ohntrup* and *Alameda* that this burden should not be too onerous is persuasive. On balance, the more appropriate burden to be met by the plaintiff is that stated in *Ungar*, namely "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff."

---

**8.** Rule 703 provides in its entirety:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. *Facts or data that are otherwise inadmissible shall not be dis-*

### b) Evidence to be considered

Although affidavits are generally inadmissible at trial, they may be used in hearings pursuant to § 1608(e). *See Hutira v. Islamic Republic of Iran*, 211 F.Supp.2d 115, 124 (D.D.C.2002); *see also Rafidain Bank*, 15 F.3d at 241 (upholding court's use of and conclusions based on affidavits). Plaintiffs do not contend and I do not find any precedent that permits the Court to suspend the rules of evidence, in particular the rules with respect to hearsay, in an inquest on damages pursuant to § 1608(e). *See Hutira*, 211 F.Supp.2d at 123–24 (holding that a newspaper article was inadmissible as hearsay in a § 1608(e) hearing on damages). Plaintiffs contend that certain statements, for example one by an Iraqi defector that appeared in a *Frontline* interview about a terrorist-training facility, are admissible under exceptions to the hearsay rule. As every first-year law student knows, hearsay is an out-of-court unsworn statement offered for the truth of the matter asserted, and hearsay is inadmissible except in certain situations where there are sufficient indicia of trustworthiness. *See* Fed.R.Evid. 801, 802, 803, 804. Furthermore, while expert witnesses may rely on hearsay evidence to reach their conclusions, such evidence relied upon by the expert is otherwise inadmissible for any substantive purpose unless it is covered by an exception to the hearsay rule. *See* Fed.R.Evid. 703.[8] According to a leading treatise:

*closed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.* Fed.R.Evid. 703 (emphasis added). *But see* John Sheldon & Peter Murray, *Rethinking the Rules of Evidentiary Admissibility in Non–Jury Trials*, 86 Judicature 227 (Mar.-Apr.2003) (suggesting that rules of admissibility should not be applied in non-jury trials).

[Rule 703] "provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert."

. . .

. . . If the trial court determines that the underlying information should be disclosed to the jury, the disclosure can only be for that limited purpose [of assisting the jury in evaluating the expert witness's testimony], and the court, on request, should give the jury a limiting instruction informing it that *the underlying information must not be used for any substantive purpose.*

4 Weinstein's Federal Evidence § 703.05 (quoting Fed.R.Evid. 703 committee note (2000)) (emphasis added).

### 2. Substantive laws relied on by plaintiffs against Iraq and Saddam Hussein

Plaintiffs bring their claims against Iraq and Saddam Hussein based on two statutes, the Antiterrorism Act of 1991 (18 U.S.C. § 2333) and the Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)(7)).

### a) Antiterrorism Act, 18 U.S.C. § 2333

■ As discussed *supra,* 18 U.S.C. § 2333 creates a cause of action for the "estate, survivors, or heirs" of any U.S. national killed by an act of international terrorism. However, 18 U.S.C. § 2337 appears to expressly foreclose an action against Iraq and its leader. This provision of the ATA states: "No action shall be maintained under section 2333 of this title against . . . *a foreign state,* an agency of a foreign state, *or an officer* or employee *of a foreign state* or an agency thereof *acting within his or her official capacity* or under color of legal authority." *Id.* § 2337 (emphasis added). Plaintiffs contend that this provision does not apply here because 28 U.S.C. § 1605(a)(7)[9] has stripped Iraq and Saddam Hussein of the protection of § 2337. *See* Pl. Proposed Findings of Fact and Conclusions of Law ¶ 69, at 31. I disagree.

Plaintiffs misses the point.[10] The issue is *not* whether 2337 bars suit against Iraq and Saddam Hussein under FSIA § 1605(a)(7)—it certainly does not—but whether plaintiffs have a cause of action under § 2333, which permits treble damages for civil violations of the ATA. Section 2337 could not be clearer it prevents suits under § 2333 against foreign states and officers wherein a plaintiff who prevails would be entitled to treble damages. *See Cronin,* 238 F.Supp.2d at 231 n. 2 ("The problem with invoking [18 U.S.C. § 2333(a) against a foreign state] is 18

**9.** In the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress modified § 1605(a) of the FSIA to lift the immunity to suits in U.S. courts of foreign states that are officially designated as sponsors of terrorism for certain tortious acts. Pub.L. 104–132, Title II, § 221(a), (Apr. 24, 1996), 110 Stat. 1241, codified at 28 U.S.C. § 1605(a)(7). The statute provides:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . (7) . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency. . . .

28 U.S.C. § 1605(a).

**10.** For example, plaintiffs state, incorrectly in my view, that Judge Lamberth "held that 18 U.S.C. § 2337 does not bar suit against a state Sponsor of Terrorism." *See* Pl. Supp. Memo. of Law 2.

U.S.C. § 2337 explicitly provides that 'no action shall be maintained under section 2333 of this title against ... a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority.' "). Thus, plaintiffs cannot rely on § 2333 against Iraq or Saddam Hussein.

### b) FSIA, 28 U.S.C. § 1605(a)(7)

■ Section § 1605 of FSIA performs two functions: First, § 1605(a)(7) withdraws sovereign immunity and grants federal courts *in personam* jurisdiction over a foreign state in certain enumerated circumstances. *See Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222, 230 (D.D.C.2002). Second, a law commonly referred to as the "Flatow Amendment" [11] provides a cause of action to victims of state-sponsored terrorism. *See Cronin*, 238 F.Supp.2d at 230.

> To create a cause of action for victims of state-sponsored terrorist acts, Congress passed an amendment to section 1605(a)(7) entitled "Civil Liability for Acts of State Sponsored Terrorism." Pub.L. No. 104–208, § 589, 110 Stat. 3009 (1996) (codified at 28 U.S.C. § 1605(a)(7) note). This provision, commonly referred to as the 'Flatow Amendment,' ... provides that '[a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism ... while acting within the scope of his or her office, employment, or agency shall be liable to a United States national ... for personal injury

or death caused by acts of that official, employee, or agent for which the court of the United States may maintain jurisdiction under section 1605(a)(7)[.]'

*See Cronin*, 238 F.Supp.2d at 230. A cause of action under the Flatow Amendment requires proof of the following elements: 1) that personal injury or death resulted from an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking; 2) the act was either perpetrated by the foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant; 3) the act or the provision of material support or resources is engaged in by an agent, official or employee of the foreign state while acting within the scope of his or her office, agency or employment; 4) the foreign state must be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and 5) either the plaintiff or the victim was a United States national at the time of the incident. *See* 28 U.S.C. § 1605 note. In addition to these five elements, Congress placed an important limitation on this cause of action: "No action shall be maintained under this action if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States." *Id.* Presumably, plaintiffs must also show a proximate cause between the support and resources provided, and that the defendant knew and intended to further the criminal acts.[12]

---

11. Pub.L. No. 104–208, Div. A, Title I, § 101(c) [Title V, § 589] (Sept. 30, 1996), 110 Stat. 3009–172, *codified at* 28 U.S.C. § 1605 (note).

12. In *Boim*, the Seventh Circuit held that to recover from a defendant who provides financing or material to a terrorist organiza-

tion under 18 U.S.C. § 2339A, plaintiff must show knowledge of and intent to further the criminal acts and proximate cause. *See Boim*, 291 F.3d at 1011–12, 1015, 1023. The Boim analysis seems relevant because § 1605(a)(7) borrows the definition of "provide material support" from 18 U.S.C. § 2339A.

*See Boim v. Quranic Literacy Institute,* 291 F.3d 1000, 1011–12, 1015, 1023 (7th Cir.2002)

Before turning to the plaintiffs' proof on each of these elements, it is necessary to point out that there is a threshold question of whether the Flatow Amendment permits a cause of action against a foreign state such as Iraq. The Flatow Amendment provides a cause of action against a foreign state's officials, employees and agents, but does not expressly provide a cause of action against the foreign state itself. *See Cronin,* 238 F.Supp.2d at 230; *Price v. Socialist People's Libyan Arab*

*Jamahiriya,* 294 F.3d 82, 87 (D.C.Cir. 2002).[13] The majority view permits a cause of action against a foreign state,[14] despite the lack of clarity in the statute. However, most if not all of these decisions have been in the context of default judgments which lack "the benefit of the adversarial process to put any pressure on these interpretations." *See Roeder v. Islamic Republic of Iran,* 195 F.Supp.2d 140, 171–73 (D.D.C.2002) (holding that there was no cause of action against Iran under 1605(a)(7)); [15] *cf. Price,* 294 F.3d at 87 (deferring decision because there was no briefing or argument). Further, it was

**13.** In *Price,* the D.C. Circuit stated:

The FSIA is undoubtedly a jurisdictional statute which, in specified cases, eliminates foreign sovereign immunity and opens the door to subject matter jurisdiction in the federal courts. There is a question, however, whether the FSIA creates a federal cause of action for torture and hostage taking *against foreign states.*

The "Flatow Amendment" to the FSIA confers a right of action for torture and hostage taking against an 'official, employee, or agent of a foreign state,' but the amendment does not list "foreign states" among the parties against whom such an action may be brought. *Price,* 294 F.3d at 87 (citations omitted)). Without the benefit of briefing or argument, the *Price* court deferred the issue to the district court. *See id.*

**14.** *See Cronin,* 238 F.Supp.2d at 231 ("[T]he Flatow Amendment does provide victims of state-sponsored acts of terrorism with a cause of action against the culpable foreign state."); *Surette v. Islamic Republic of Iran,* 231 F.Supp.2d 260, (D.D.C.2002) (allowing, without discussion, a case against Iran under § 1605(a)(7)); *Daliberti v. Republic of Iraq,* 146 F.Supp.2d 19 (D.D.C.2001) (allowing suit against Iraq based on statute's withdrawal of sovereign immunity for sponsorship of terrorism); *Elahi,* 124 F.Supp.2d at 106 (concluding that Flatow Amendment creates a cause of action against a foreign state); *Higgins v. Islamic Republic of Iran,* 2000 U.S. Dist. LEXIS 22173, Civ. A. No. 99–377, 2000 WL 33674311 (D.D.C.2000) (allowing, with little discussion, a case against Iran under § 1605(a)(7)); *Cicippio v. Islamic Republic of*

*Iran,* 18 F.Supp.2d 62 (D.D.C.1998) (allowing suit against Iran based on statute's withdrawal of sovereign immunity for sponsorship of terrorism).

In *Cronin,* Judge Lamberth concluded that the Flatow Amendment does create a cause of action against a foreign state, despite the absence of such express direction. In reaching this result, Judge Lamberth noted that 1) the Flatow Amendment must be read in light of 1605(a)(7) which employs the language of respondeat superior and this should be read into the Flatow Amendment lest the statutory scheme be turned on its head; 2) its legislative history indicates the primary purpose of the Flatow Amendment was to increase the measure of damages available in suits under 1605(a)(7) and that this purpose would be thwarted if there was no cause of action against a foreign state; and 3) other statutory enactments, particularly the Victims of Trafficking and Violence Protection Act of 2000, imply that Congress intended to create a cause of action against a foreign state under 1605(a)(7). *See Cronin,* 238 F.Supp.2d at 231–34.

**15.** Significantly, *Roeder* involved an additional element that is not present here, namely whether the Flatow Amendment and several other enactments abrogated the so-called Algiers Accord, the agreement under which Iran agreed to free the Americans seized and held hostage for 444 days from 1979–1981. *See Roeder,* 195 F.Supp.2d at 147–48; *see also Dames & Moore v. Regan,* 453 U.S. 654, 664–65, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

enacted as a rider, with little legislative history, to an appropriations bill. *See Roeder*, 195 F.Supp.2d at 173–74. However, enactments subsequent to the Flatow Amendment, in particular the Victims of Trafficking and Violence Protection Act of 2000, imply that it does reach foreign states. *See, e.g., Cronin*, 238 F.Supp.2d at 231; *see also Roeder*, 195 F.Supp.2d at 172. While not free from doubt, the better view in my opinion is that the Flatow Amendment likely provides a cause of action against a foreign state.

█ Several of these elements of a cause of action under the Flatow Amendment require little discussion. There can be no doubt that Mr. Soulas' and Mr. Smith's deaths resulted from aircraft sabotage, and, seemingly, hostage taking and extrajudicial killing as well (first element); that both victims were U.S. nationals at the time of the incident (fifth element), *see* Tr. 186; and that since 1990 the United States has designated Iraq as a state-sponsor of terrorism (fourth element). *See* E.O. 12722, 55 F.R. No. 150, 31803 (Aug. 3, 1990). Plaintiffs cite *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)), for the proposition that a U.S. agent, official, or employee would be liable if he or she perpetrated similar conduct. The fact that *Bivens* permits a cause of action against a federal agent, however, is only part of the equation. The Supreme Court has held that a claim against a U.S. president for the conduct identical to that alleged against Saddam Hussein would be barred because of the president's absolute immunity from damages for conduct associated with the exercise of his official duties. *See Nixon v. Fitzgerald*, 457 U.S. 731, 749, 102 S.Ct. 2690, 73 L.Ed.2d 349

(1982); *cf. Price*, 294 F.3d at 88–89 ("Executive branch officials feared that the proposed amendment to FSIA might cause other nations to respond in kind, thus potentially subjecting the American government to suits in foreign countries for actions taken in the United States."). Thus, because the Flatow Amendment expressly bars an action "if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States," the plaintiffs cannot satisfy this element as against Saddam Hussein and so the claim against him must be dismissed.

The other two elements—1) that the act was either perpetrated by the foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant and 2) the act or the provision of material support or resources is engaged in by an agent, official or employee of the foreign state while acting within the scope of his or her office, agency or employment—require closer consideration. Plaintiffs' theory is that Iraqi agents provided material support to bin Laden and al Qaeda in the form of training, providing safehouses, and document forgery.[16]

### (1) The Proof

The analysis of these two troubling elements and their resolution will dictate the validity of the cause of action under the Flatow Amendment.

█ Two expert witnesses testified at the inquest on the issue of Iraq's complicity with al Qaeda: Robert James Woolsey, Jr., the Director of Central Intelligence from February 1993 to January 1995; and Dr. Laurie Mylroie, an expert on Iraq and

---

**16.** Section § 2339A of Title 18 defines "providing material support" to include such activities as training, providing safehouses, and document forgery, and § 1605(a)(7) of FSIA adopts this definition. *See* 28 U.S.C. § 1605(a)(7).

its involvement in terrorism generally and the bombing of the World Trade Center in 1993 in particular. Dr. Mylroie described Iraq's covert involvement in acts of terrorism against the United States in the past, including the bombing of the World Trade Center in 1993. Dr. Mylroie testified to at least four events that served as the basis for her conclusion that Iraq played a role in the September 11 tragedy: First, she claimed that Iraq provided and continues to provide support to two of the main perpetrators of the bombing of the World Trade Center in 1993. Specifically, Abdul Rahman Yasin returned to Baghdad after the bombing and Iraq has provided him safe haven ever since. *See* Tr. 175–76. Also, Ramsey Yusef arrived in the United States on an Iraqi passport in his own name but left on false documentation—a passport of a Pakistani who was living in Kuwait and whom the Kuwaiti government kept a file on at the time that Iraq invaded Kuwait. *See* Tr. 174. Second, she noted bin Laden's *fatwah* against the United States, which was motivated by the presence of U.S. forces in Saudi Arabia to fight the Gulf War against Iraq. *See* Tr. 177. Third, she noted that threats by bin Laden in late 1997 and early 1998 which led up to the bombing of the U.S. embassies (on

August 7, 1998) were "in lockstep" with Hussein's threats about ousting the U.N. weapons inspectors, which he eventually did on August 5, 1998. *See* Tr. 178–79. Dr. Mylroie concluded that "Iraq, I believe, did provide support and resources for the September 11 attacks. I agree with Captain Khodada when he said that . . . it took a state like Iraq to carry out an attack as really sophisticated, massive and deadly as what happened on September 11." *See* Tr. 182. She further testified, "I think that in many respects, al Qaeda acts as a front for Iraqi intelligence. Al Qaeda provides the ideology, the foot soldiers and the cover . . . [a]nd Iraq provides the direction, the training and the expertise." *See* Tr. 182–83.

Director Woolsey reviewed several facts that tended in his view to show Iraq's involvement in acts of terrorism against the United States in general[17] and likely in the events of September 11 specifically. First, Director Woolsey described the existence of a highly secure military facility in Iraq where non-Iraqi fundamentalists (*e.g.*, Egyptians and Saudis) are trained in airplane hijacking and other forms of terrorism. Through satellite imagery and the testimony of three Iraqi defectors,[18] plain-

17. In particular, Director Woolsey stated that independent forensic analysis by both the CIA and FBI confirmed that a bomb made by the Iraqi intelligence service (the Mukabarat) was to be used in the attempted assassination of President George H. Bush during a visit in 1993 to Kuwait City. *See* Tr. 145.

18. These three are 1) Capt. Sabah Khodada who was interviewed for a *Frontline* piece and by former CIA Director James Woolsey, 2) an unnamed former lieutenant general of the Iraqi military, and 3) the former head of Iraq's nuclear program, Dr. Khidhir Hamza, who testified before the Senate Committee on Foreign Relations about the threats posed by Iraq.

Plaintiffs contend that Capt. Khodada statements in the interview are admissible either as an unavailable witness's statements against interest (Fed.R.Evid.804(b)(3)) or under the residual exception to the hearsay rule (Fed. R.Evid.807). (Plaintiffs do not explain whether and how Dr. Hamza's and the lieutenant general's statements are admissible but presumably it is for the same reason as Capt. Khodada.) Apparently, these are statements against interest because, according to Dr. Mylroie, a person who provides information contrary to the national interests of Iraq is at significant risk of retaliation. *See* Tr. 180. Rule 804(b)(3) considers statements that are "at the time of [their] making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability" to be sufficiently inherently trustworthy. Capt. Khodada's statements in the *Frontline* interview are apparently not against his pecuniary/proprie-

tiffs demonstrated the existence of this facility, called Salman Pak, which has an airplane but no runway. The defectors also stated that these fundamentalists were taught methods of hijacking using utensils or short knives. Plaintiffs contend it is farfetched to believe that Iraqi agents trained fundamentalists in a top-secret facility for any purpose other than to promote terrorism.

Second, Director Woolsey mentioned a meeting that allegedly occurred in Prague in April 2001 between Mohammad Atta, the apparent leader of the hijackings, and a high-level Iraqi intelligence agent. According to James Woolsey, the evidence indicates that this was an "operational meeting" because Atta flew to the Czech Republic and then returned to the United States shortly afterwards.[19] The Minister of Interior of the Czech Republic, Stanislav Gross, stated on October 26, 2001:

> In this moment we can confirm, that during the next stay of Muhammad Atta in the Czech republic there was the contact with the official of the Iraqi Intelli-

gence, Mr. Al Ani, Ahmed Khalin Ibrahim Samir, who was on 22nd April 2001 expelled from the Czech Republic on the basis of activities which were not compatible with the diplomatic status. As for the details of their contact, these are under investigation and I would like to remind you in this moment that neither I nor anyone else from the Police of the Czech Republic or intelligence services of the Czech Republic will not give you any more detailed information about this contact and his stay and traveling in the Czech Republic until further investigation of the facts, which we need to investigate.

*See* Letter from Hynek Kmoníček, Ambassador of the Czech Republic to the United Nations, to James E. Beasley, Counsel for Plaintiffs 1–2 (Feb. 24, 2003). This purported event,[20] if true, certainly suggests a link between Iraq and al Qaeda and the events of September 11. However, as Director Woolsey noted, there remains some dispute about whether this meeting actually occurred.[21]

---

tary or penal interest, but rather against his life. However, plaintiffs have not directly indicated that his statements placed him or his family or his property in any peril; while it certainly appears that he who crosses Saddam Hussein does so at tremendous peril, it is not clear that at the time Capt. Khodada gave the *Frontline* interview Saddam Hussein had any leverage against him, which is the relevant test. Plaintiffs have introduced an affidavit of an experienced investigator who attests that he was unable to locate Capt. Khodada and have implied that Capt. Khodada is in hiding. The efforts Capt. Khodada has recently taken to conceal himself are indicative of his apparent fear for his life at the present, but is not necessarily probative of what peril he perceived when he gave the interview.

19. With respect to the evidence that indicated a possible "operational meeting," Director Woolsey stated:

> It's my understanding ... that based on the rental car records, we have at least some

indication that Mohammed Atta traveled on the weekend in which the Czech service puts him in Prague, traveled from the United States. He did not, I don't think, travel on his own passport.... I think what we're talking about is rental car records, airports and the like.

Tr. 161.

20. As Minister Gross's statement is prototypical hearsay, it is inadmissible here for any substantive purpose, unless it meets another hearsay exception. The closest applicable exception, government reports, clearly does not apply to a statement such as this.

21. In the Ambassador's letter to plaintiffs' counsel of Feb. 24, 2003, he notes that "From the 26th October, 2001 my mission did not receive any further information or statement regarding this matter"—an apparent reference to Mr. Gross's statements about further investigation. It appears from his letter that Ambassador Kmoníček is reporting, not endorsing, Minister Gross's statement.

Third, Director Woolsey noted that his conclusion was also based on "contacts," which refer to interactions between Hussein/Iraq and bin Laden/al Qaeda that are described in a letter from George Tenet, the Director of Central Intelligence, to Senator Bob Graham on October 7, 2002. Director Tenet's carefully worded letter included in substance the same allegations, but with less detail, that Secretary of State Colin Powell made before the U.N. Security Counsel on Feb. 5, 2003, in his remarks about "the potentially much more sinister nexus between Iraq and the al-Qaida terrorist network." Both Director Tenet and Secretary Powell mentioned "senior level contacts" between Iraq and al Qaeda going back to the early 1990s (although both acknowledged that part of the interactions in the early to mid 1990s pertained to achieving a mutual non-aggression understanding); both mentioned that al Qaeda sought to acquire poison gas and training in its use from Iraq; both mentioned that al Qaeda members have been in Iraq, including Baghdad, after September 2001.[22] It is important to note that both Director Tenet's letter and Secretary Powell's remarks contain multiple layers of hearsay.

Finally, plaintiffs also place considerable weight on an article that appeared in a regional Iraqi newspaper in July 2001, two months before the disaster of September 11. This article, a paean to bin Laden, mentions that bin Laden 1) "will try to bomb the Pentagon after he destroys the White House," 2) "is insisting very convincingly that he will strike America on the arm that is already hurting," and 3) "will curse the memory of Frank Sinatra every time he hears his songs." *See* Exs. 16–18, Naeem Abd Muhalhal, America, An Obsession Called Osama Bin Ladin, Al-Nasiriya, July 21, 2001 (original, translation, and certificate of accuracy of translation).[23] Because, according to Director Woolsey, "all publications in Iraq really appear at the sufferance of and with a full vetting by the Iraqi regime," *see* Tr. 158, and because of the coincidences and the fact that "[t]here is a certain propensity, I think, on bin Laden's part and on Saddam's part ... to try to communicate in somewhat vague terms," Director Woolsey concluded that there is a probability of a vague foreknowledge of what was contemplated. *See* Tr. 159.

Based on these facts, he offered the following opinion:[24]

> I would say that based on all the material about Salman Pak; based on the statement of Director Tenet's about the contacts, terrorism and so forth going back into the past; based on what I still believe is quite likely to have been this meeting in 2001 between Al–Ani and

---

**22.** Secretary Powell described in some detail that in northern Iraq there is a "terrorist network" headed by "an associate and collaborator" of bin Laden, Abu Massad Al–Zakawi. Secretary Powell noted that northern Iraq is not under Saddam Hussein's control, but stated that "Baghdad has an agent in the most senior levels of the radical organization that controls this corner of Iraq." He also stated that Zakawi was in Baghdad for two months in 2002 after a hospitalization and that Iraq's denials of its connections to al Qaeda are not credible.

**23.** Plaintiffs contend that "the arm that is hurting" is a reference to the bombing of the

World Trade Center in 1993 and that the reference to Frank Sinatra is an allusion to the song "New York, New York" for which he is famous; and that it is widely thought that the plane that was downed in Pennsylvania was intended for the White House.

**24.** When asked whether these are the types of materials ordinarily considered by the Director of Central Intelligence, Director Woolsey noted that although he has "a lot of experience in intelligence matters," he is trained as a lawyer, not a security analyst. *See* Tr. 163.

Mohammed Atta; and based on even to some extent this article, ... I believe it is definitely more likely than not that some degree of common effort in the sense of aiding and abetting or conspiracy was involved here between Iraq and al Qaeda.

*See* Tr. 160.

I conclude that plaintiffs have shown, albeit barely, "by evidence satisfactory to the court" that Iraq provided material support to bin Laden and al Qaeda. As noted above, a very substantial portion of plaintiffs evidence is classically hearsay (and often multiple hearsay), and without meeting any exceptions is inadmissible for substantive purposes. Thus, the hearsay rule prevents the Court from considering as substantive evidence: the Ambassador of the Czech Republic's letter which repeats Minister Gross's statement about a meeting between Atta and al Ani in Prague, the contacts described in CIA Director Tenet's letter to Sen. Graham, the evidence that Secretary Powell recited in his remarks before the U.N., and the defectors' descriptions about the use of Salman Pak as a camp to train Islamic fundamentalists in terrorist. However, the opinion testimony of the plaintiffs' experts is sufficient to meet plaintiffs' burden that Iraq collaborated in or supported bin Laden/al Qaeda's terrorist acts of September 11. Although these experts provided few actual facts of any material support that Iraq actually provided, their opinions, coupled with their qualifications as experts on this issue, provide a sufficient basis for a reasonable jury to draw inferences which could lead to the conclusion that Iraq provided material support to al Qaeda and that it did so with knowledge and intent to further al Qaeda's criminal acts. In particular, Dr. Mylroie testified about Iraq's covert involvement in the World Trade Center bombing in 1993 and about the proximity of the dates of bin

Laden's attack on the U.S. embassies and Hussein's ouster of U.N. weapons inspectors. Juries are invited to draw inferences from facts presented and this constitutes circumstantial evidence and this is what the Court has done here. My decision reflects no more than that the facts and the available inferences meet the plaintiffs' burden of proof.

## III. DAMAGES

As indicated above, as non-state actors who have failed to appear in this lawsuit, the "al Qaeda defendants" are liable to the plaintiffs for the deaths of Tim Soulas and George Eric Smith, under 18 U.S.C. § 2333, which provides for treble damages. Iraq is also liable under the Flatow Amendment for economic loss, pain and suffering, and loss of solatium.

### A. George Eric Smith

Mr. Smith was 38 years old when he was killed. He was a senior business analyst for SunGard Asset Management, having risen in that company over the span of eleven years from an accounting clerk. He was single and without children. Despite a childhood fraught with adversity, Mr. Smith achieved notable success in business. He rose from an accounting clerk to a senior business analyst in a matter of ten years, and had a promising career ahead of him. His estate claims the following damages: $2.95 million for lost earnings,[25] $1,580 for funeral expenses, and $10 million for pain and suffering. His family members also claim solatium damages against Iraq pursuant to the Flatow Amendment. The Court makes the following award of damages to his estate and his heirs:

---

**25.** Plaintiffs take the midpoint of two different projections of future lost earnings.

## 1. Economic Damages

The estate is entitled to the expenses incurred for his funeral services ($1,580) [26] and for his lost earnings ($1,113,280), for a total of $1,114,860. All defendants are jointly and severally liable for this amount.[27] Because Mr. Smith's estate is entitled to treble damages against the al Qaeda defendants pursuant to § 2333, the al Qaeda defendants are jointly and severally liable for an additional $2,229,720.

Lost earnings consist of the salary and benefits, less personal maintenance expenses and taxes, that it is projected he would have earned over the course of his work life. Mr. Smith's income for 2001, which is used to calculate his lost earnings, came to $70,000, which is the salary he was apparently in line to receive just before his death.[28] Accordingly, if Mr. Smith, who was 38.6 years of age at the time of his death, worked until he was 67 years old, which is the normal retirement age under the Social Security System, *see* Report of David L. Hopkins, 2/13/2003, Ex. 36, at 2, his future worklife expectancy would be 28.4 years.[29] Thus, Mr. Smith's $70,000 annual salary for 28.4 years comes to $1,988,000. From this amount are deducted taxes, which the expert estimated would be 21 percent of income or $417,480, and personal maintenance expenses, which the expert estimated would be 23 percent of income or $457,240. Thus, Mr. Smith's expected net earnings over the course of his working life total $1,113,280. (These figures include neither inflation nor reduction of future earnings to present value, and instead assume that they will essentially cancel each other out.)

## 2. Pain and suffering

■ The effort after a tragedy of this nature to calculate pain and suffering is difficult at best. Unfortunately, there is no way to bring back Mr. Smith and no way to even come close to understanding what he or Mr. Soulas experienced during their last moments. Under our legal system, compensation can only be through the award of a sum of money. While always difficult and never exact, the devastation and horror accompanying this tragedy makes a realistic appraisal almost impossible.

---

26. There have been two memorial services for George Smith. The first was held on October 14, 2001, at Calvary Bible Church in Phoenixville, Pennsylvania. The expenses associated with that service were paid for by Mr. Smith's employer, and the administrator of Mr. Smith's estate make no claim for those costs. The second memorial service was held on March 29, 2002 at the Limerick Garden of Memories in Limerick, Pennsylvania after Mr. Smith's remains were found at the World Trade Center site. The expenses associated with that service amount to $1,580.00, and invoices relating to this item of damages are in evidence. *See* Ex. 33.

27. The general rule in New York for the apportionment of liability among multiple tortfeasors for an indivisible harm is that the tortfeasors are liable only for their equitable shares of non-economic damages in accordance with their culpability. *See* N.Y. C.P.L.R. § 1601. However, this rule is inapplicable where, as here, the actions require proof of intent. *See* N.Y. C.P.L.R. § 1601; *see also* Restatement (Third) of Torts § 12 (2000) ("Each person who commits a tort that requires intent is jointly and severally liable for any indivisible injury legally caused by the tortious conduct."); *Chianese v. Meier*, 98 N.Y.2d 270, 277, 746 N.Y.S.2d 657, 774 N.E.2d 722 (2002).

28. The actuarial expert calculated that his estimated earnings for 2001 would have been approximately $87,000, which is an amount indicated on his 2001 W–2 apparently representing what he earned through mid-September ($72,917) plus 2.5 more months at an increased salary of $70,000, which he was allegedly in line to receive.

29. According to the U.S. Life Tables of the U.S. Department of Health and Human Services, his life expectancy was 41.7 years.

There is no direct evidence of when Mr. Smith was killed and therefore what pain and suffering he endured, but plaintiff urges that it is reasonable to infer he survived the crash of the plane into the South Tower, where he worked. Mr. Smith telephoned a SunGard vice president minutes after the first tower—*i.e.,* not the tower he was in—was hit to say that it was on fire, and he was told that the cause of the fire was a plane and that he should get out. His office was on the 97th floor and the second plane that struck his building did so between the 73rd and 82nd floor, thus creating the possibility that he was killed while descending at the instant that the second plane hit his building. Plaintiffs suggest a figure of $10 million for Mr. Smith's pain and suffering, but, not surprisingly, offer no guidance on how this figure is derived. Given the uncertainty of when Mr. Smith was killed and the pain and suffering, if any, he endured, an award of $1 million is appropriate. Again, since the al Qaeda defendants and Iraq are jointly and severally liable, they are all responsible for the payment of any judgment that may be entered. Because Mr. Smith's estate is entitled to treble damages against the al Qaeda defendants pursuant to § 2333, the al Qaeda defendants are jointly and severally liable for an additional $2 million for his pain and suffering.

### 3. Solatium damages

The Flatow Amendment provides that plaintiffs can recover damages for loss of solatium, which is defined as "[d]amages allowed for injury to the feelings," *see* Black's Law Dictionary 1391 (6th ed.1990), or "for the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death." *See Higgins v. Islamic Revolutionary Guard,* No. 99 Cv. 00377, 2000 WL 33674311, 2000 U.S. Dist. Lexis 22173, at *21 (D.D.C. Sept. 21, 2000) (citing *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1 (D.D.C. 1998)). According to the court in *Flatow,* which provided an extensive discussion of solatium:

Solatium ... began as a remedy for the loss of a spouse or a parent. It has since expanded to include the loss of a child, including in some states the loss of an emancipated or adult child. Where the claim is based upon the loss of a sibling, the claimant must prove a close emotional relationship with the decedent.

*Flatow,* 999 F.Supp. at 29–30 (citations and footnote omitted). "Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish. The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium." *Id.* at 30. The factors commonly considered in computing awards for loss of solatium include:

(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (*i.e.* closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death.

*Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 90 (D.D.C.2002).

Plaintiffs seek solatium damages for the relatives of George Smith as follows: $5 million for his father (Raymond Anthony Smith), his grandmother (Marion Thomas), and for each of his siblings (Deborah Sallad, Elaina Smith, Carl Smith) and his step-siblings (Tanya Warren, Barbara Dixon, Letricia Smith, Korry Smith, and Kevin Smith). Plaintiffs refer to a series of

cases as guideposts in which spouses of victims of terrorism have been awarded between $8–12 million, parents between $2.75–5 million, children between $5–12 million, and siblings between $2.5 and 5 million.[30] These cases are instructive to the extent that they also involve victims of terrorism and thus share several of the factors that *Stethem* enumerated, *e.g.*, that the deaths were sudden and unexpected and attributable to malice. It should be noted that they each involve horrific circumstances that may equal or surpass the circumstances presented here. *See, e.g., Higgins*, 2000 U.S. Dist. Lexis 22173 (Marine Corps colonel held hostage for approximately 529 days brutally tortured and eventually murdered; a videotape of him hanging by his neck was broadcast around the world and seen by his relatives); *Weinstein*, 184 F.Supp.2d at 17 (passenger on bus injured by suicide bomb remained conscious and in extreme pain for 49 days before dying of the wounds); *Surette*, 231 F.Supp.2d at 262 (high-ranking CIA agent was held hostage for over fourteen months and eventually died due to torture and lack of medical care); *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107 (D.D.C. 2000) (plaintiff was kidnapped and tor-

tured for seven years). Farther, plaintiffs fail to include several cases where lesser amounts have been awarded for loss of solatium. *See Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27, 37 (D.D.C.2001) (siblings awarded $1.5 million each where torture-victim survived and was returned to live among family for ten years); *Kerr v. Islamic Republic of Iran*, 245 F.Supp.2d 59, 64 (D.D.C.2003) ($3 million awarded to decedent's children and $1.5 million awarded to decedent's siblings). Plaintiffs also fail to show how their circumstances compare with those in the cases they do cite. *See Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 30 (D.D.C.1998) ("As damages for mental anguish are extremely fact-dependent, claims require careful analysis on a case-by-case basis.").

As noted above, George Smith was born into and raised amid very difficult circumstances. George was the third child of five (and first boy) of Raymond Alexander Smith and Georgia Lee Jackson,[31] who were married in 1960 and lived together in Philadelphia, Pa., until they separated in 1963. In 1964, his father moved away to Albany, N.Y., where he met Barbara Miller with whom he fathered five more children.[32] (He also had an eleventh child,

**30.** *Alejandre v. Republic of Cuba*, 996 F.Supp. 1239 (S.D.Fla.1997) ($8 million to spouse, $8 million to daughter, and $5.5 million to both parents); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C.1998) ($5 million to each parent and $2.5 million to each sibling); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62 (D.D.C.1998) ($10 million to each spouse); *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107 (D.D.C.2000) ($10 million to spouse and $6.7 million to daughter of journalist who was kidnapped and held hostage for nearly seven years); *Higgins v. Islamic Republic of Iran*, 2000 WL 33674311, 2000 U.S. Dist. Lexis 22173 (D.D.C.2000) ($12 million to spouse and $12 million to decedent's daughter from prior marriage who was held hostage and viciously tortured for 529 days before being executed); *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97

(D.D.C.2000) ($5 million to each sibling); *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13 (D.D.C.2002) ($8 million to spouse and $5 million to each child).

**31.** These children are: Christina, born in 1960; Deborah, born in 1961; George, born Jan. 21, 1963; Elaina, born in 1964; and Carl, born in 1965. Christina, Debbie, and George lived with their mother until her untimely death. Mr. Smith does not indicate what happened to Carl. Of these four siblings, all except Christina seek loss of solatium.

**32.** These children are Tanya, born in 1963; Raymond, born in 1965; Barbara, born in 1966; and Korry and Kevin, twins born in 1971. All of these five step-siblings seek loss-of-solatium damages.

Letricia Smith, by a third woman.) George's younger sister Elaina, who was born in 1964, was abandoned at the hospital and raised by an aunt, unaware until her teens that she had older siblings.[33] Because their mother was infrequently around, George and his sisters Christina and Deborah were raised mainly by their maternal grandmother until her death. George's older sister Deborah describes how the three of them slept in the same bed and fell asleep at night to the sound of rats in the room. In 1973, George's mother was killed by a stray bullet and for several weeks the children took care of themselves until a neighbor eventually contacted their paternal grandmother, Marion Thomas, who took the children in to her home in Phoenixville, Pa. In either 1975 or 1976, George's father returned to Pennsylvania and moved into his mother's house in Phoenixville.

■ On these facts, the Court has no reservation about concluding that George's paternal grandmother Marion Thomas is entitled to loss-of-solatium damages. Although plaintiffs have not cited any precedent where a grandparent has been awarded these damages, it is clear that she was George's surrogate mother since 1973 and that they developed an extremely close bond. *Cf. Surette*, 231 F.Supp.2d at 270 (awarding solatium to decedent's unmarried partner for over twenty years). All testimonials submitted note the closeness of this relationship, which Ms. Thomas described as follows:

> He and I were very close when he was a boy and that closeness did not diminish when he got older. He made a point to keep in touch with me no matter where he was or what he was doing. If he was out of town, he would call me on the phone. If he went on vacation, he would

send me letters or postcards. If he was in the area, he would always stop in to see me.

Marion Thomas Aff. at 1–2. She also poignantly attested that she was recently diagnosed with ovarian cancer and is in hospice care and that it has been especially difficult facing her illness and end of her life without her grandson, who was clearly as important to her as she was to him. Accordingly, Ms. Thomas is entitled to recover $3 million for loss of solatium.

■ Although it appears that George's father was not always fully present in his son's life, the Court determines that Raymond Alexander Smith is entitled to recover for loss of solatium, but that this award should reflect the circumstances of their attenuated relationship. The elder Mr. Smith stated that during the time he lived apart from George, he paid child support to Ms. Jackson and would "try to drive down to Philadelphia once a month or so." He described how once he returned to Phoenixville, he took the children places and played basketball with George and attended his high school games. Mr. Smith also stated that "[i]n the years before his death, I would see George once a week or so." Based on these facts, the Court concludes that an award of $1 million is appropriate.

■ With regard to George's siblings, the Court makes the following determinations: The step-siblings, with the exception of Raymond, who moved in to Ms. Thomas's house and shared a bedroom with George for approximately four years, are not entitled to solatium damages. Similarly, George's full siblings but who did not grow up with him (Carl and Elaina), are also ineligible for such damages.

---

**33.** Although unclear, it appears that Carl, the youngest of the five children by Ms. Jackson, had a similar fate.

The Court does not doubt the profound effect of George's death on their lives, as their testimonials credibly describe how much they admired George and looked up to him. However, the evidence does not establish a "close emotional relationship." On the other hand, the Court determines that Deborah Sallad and Raymond Anthony Smith are entitled to loss of solatium. Ms. Sallad's testimony about how "carefree" and "normal" their life seemed at the time illustrates a special bond that enabled them to survive such difficult conditions. Ms. Sallad is awarded $500,000 for loss of solatium. Raymond Anthony Smith testified at the inquest that he was eight or nine when he first met his half-brother George, but that he moved down to Phoenixville with his father and shared a bedroom with George for four or five years, until George went to college. He testified that they remained in contact even when he was away at college and they saw each other three or four times a month, usually when George came to visit his grandmother. Raymond is awarded $250,000.

## B. Timothy Soulas

Timothy Soulas was the Senior Managing Director and partner at Cantor Fitzgerald Securities. He was married with 5 children, and his wife was 3–months pregnant when he was killed on September 11. The testimony and affidavits submitted paint a very convincing picture of a highly esteemed and very successful professional with a promising career. The testimony also left no doubt that he was also very devoted to and, despite the rigors of his work, very involved with his wife and children and his siblings and father. His estate seeks the following damages: $47.65 million for lost earnings, $18,603.19 for funeral expenses, and $10 million for pain and suffering. His family members also claim solatium damages. The Court makes the following award of damages for his estate and his heirs:

## 1. Economic damages

The estate is entitled to the expenses incurred for his funeral services ($18,603.19)[34] and for his lost earnings ($15,120,600), for which the al Qaeda defendants and Iraq are jointly and severally liable. Because Mr. Soulas's estate is entitled to treble damages against the al Qaeda defendants pursuant to § 2333, the al Qaeda defendants are jointly and severally liable for an additional $30,278.406.38. The calculation for lost earnings is intricate and requires some discussion.

As indicated above, lost earnings consist of the salary and benefits that it is projected he would have earned over the course of his work life, less personal maintenance expenses and taxes. For the reasons explained below, I believe the proper estimate for Mr. Soulas' income for 2001 is $850,000. Accordingly, if Mr. Soulas, who was 35.1 years of age at the time of his death, worked until he was 67 years old, which is the normal retirement age under the Social Security System, his future worklife expectancy would be 31.9 years.[35] Thus, Mr. Soulas's $850,000 annual salary for 31.9 years comes to $27,115,000. When taxes and personal maintenance expenses

---

**34.** The Executrix of Mr. Soulas' estate introduced evidence that the funeral expenses to date for Mr. Soulas are $8,603.19. (This total represents $244.50 for flowers, $1,547.60 for prayer books, $1,100.80 for a memorial book, and $5,710.29 for a memorial service luncheon on September 22, 2001.) In addition, since Mr. Soulas' remains were found after the memorial service, his Executrix will have a formal burial in the spring, with anticipated costs of approximately $10,000 (for the funeral service, burial plot, headstone, luncheon, etc.). These items total $18,603.19.

**35.** According to the U.S. Life Tables of the U.S. Department of Health and Human Services, he had a life expectancy of 41.7 years.

are deducted, his expected net lost earnings is $14,642,100. (The expert estimated his taxes at 37 percent or $10,032,550 and personal maintenance expenses at 9 percent or $2,440,350.) In addition, Mr. Soulas received approximately $15,000 per year in fringe benefits,[36] which if he continued to receive during his work life would amount to $478,500. (Again, these figures include neither inflation nor reduction of future earnings to present value.)

Plaintiffs introduced two items of evidence that bear on Mr. Soulas' projected earnings for 2001—a document prepared by Cantor Fitzgerald entitled Cantor Selected Award Calculations and the Soulas' IRS statements for the years 1996 through 2001. The reported wages and salaries reported at line 7 of 1040 and partnerships reported at line 17 on the Soulas' tax returns for these years are as follows:

1996: $601,437 + $23,544 = $624,981
1997: $631,834 + $36,000 = $667,834
1998: $539,204 + $148,817 = $688,021
1999: $603,595 + $190,979 = $794,574
2000: $479,812 + $311,225 = $791,037
2001: $155,639 + $163,162 = $318,801

Thus, the five years prior to 2001 indicate a consistent upward trend in Mr. Soulas' income, and an estimate of $850,000 for his income in 2001 represents a 7.6 percent increase from the prior year. Plaintiffs' expert actuarial economist projected Mr. Soulas' earnings over the course of his life based on a projected earnings of $1.2 million for 2001. This figure of $1.2 million, which is a 50 percent increase in the amount he reported as income for 2000, is based on the Cantor Fitzgerald report. This report stated that his total earnings (including salary and bonus, Cantor Grant Award, eSpeed Stock tranches, and partnership ordinary income) was expected to

be *$1,900,583* in 2001, and had been $1,095,569 in 1998, $831,468 in 1999, and $1,097,678 in 2000. (The expert acknowledged that portions of these amounts were not properly counted as income and reduced the figure.) The expert did not explain why he ignored the figures indicated on the Soulas's tax submissions and instead relied entirely on the Cantor Fitzgerald report, which bears no indicia of trustworthiness—it is not signed nor is there any affirmation of the accuracy of the numbers and the reliability of the accounting methods.

Accordingly, Mr. Soulas's estate is awarded $15,139,203.19 for economic damages the total of the funeral expenses, lost earnings, and lost benefits.

### 2. Pain and suffering

 As with Mr. Smith, the Court is offered a figure of $10 million for Mr. Soulas' pain and suffering, but again there is little explanation for how the plaintiffs come upon this figure. However, unlike in the case of Mr. Smith, there is direct evidence that Mr. Soulas survived the crash of the plane into the North Tower, where he was, and that he realized he was trapped and doomed. The estate therefore seeks compensation for the "intense and devastating mental pain and anguish" for knowing he was about to die and leave behind his family (wife who was three months pregnant and five children) and for the physical pain he probably endured in dying—whether from being crushed, or burned, etc. A client of his (Troy Rohrbaugh) spoke with him on a "squawk box" immediately after the plane hit his tower and approximately twenty minutes later when Mr. Soulas related that the exits were blocked and that they were doomed. He apparently tried to call his wife several

---

36. The actuarial expert based this calculation on information from Cantor that health benefits in 1998–1999 were $12,951.

times and although she answered, there was only static on the line. Given that there is clear evidence that Mr. Soulas survived the plane's impact, that the ensuing time must have been psychologically excruciating, and the likelihood that his death was very painful, the Court believes that $2.5 million is appropriate, for which all the defendants are jointly and severally liable. In addition, pursuant to § 2333, the al Qaeda defendants are liable to Mr. Soulas's estate for an additional $5 million for his pain and suffering.

### 3. Solatium damages

 Mr. Soulas's family members also claim solatium damages as follows: 1) $25 million for Tim Soulas' wife Katherine, 2) $12.5 million for each of his 6 children (Timothy Jr., Andrew, Christopher, Matthew, Nicole, and Daniel), 3) and $5 million for his father (Frederick Jr.) and each of his siblings (Frederick III, Stephen, Daniel, and Michelle).

Plaintiffs introduced ample evidence at the hearing and through affidavits of the very close relationship between Tim Soulas and his four siblings and one surviving parent. He was the fifth of six children, all close in age and close as siblings, both in their youths and as adults. This closeness was revealed and tested when the family's oldest daughter Tracey died in 1988 of a brain tumor and when Tim's mother died in 1995 after a three-year bout with pancreatic cancer. Tim Soulas' father and four surviving siblings all portray a uniquely close-knit family. Each are godparents of the others' children; remain in regular contact and spend vacations and holidays together. These testi-

monial leave no doubt about the appropriateness of substantial awards for loss of solatium to his siblings and father. Similarly, his wife Katy testified at the inquest about her relationship with her husband and his relationship with his children. The appropriateness of substantial awards for loss of solatium to Tim Soulas's wife and children also requires little additional discussion. Her testimony and the affidavits of his siblings show that he was very devoted to and involved with his wife and children. His death was sudden and unexpected and was attributable to malice. Although only one of Mr. Soulas's relatives has sought medical treatment, all his relatives credible testify to the profound impact of his tragic death. See *Flatow*, 999 F.Supp. at 31 ("Individuals can react very differently even under similar circumstances; while some sink into clinical depression and bitterness, others attempt to salvage something constructive from their personal tragedy. Such constructive behavior should not be considered as mitigating solatium, but rather as equally compensable reaction...."). Finally, the many reminders of September 11 will certainly extend the duration of the mental anguish that Mr. Soulas's relatives experience. Tim Soulas's wife is awarded $10 million, his father and his children are each awarded $3 million, and his siblings are each awarded $2 million.

### C. Punitive damages

 Plaintiffs seek to recover punitive damages against all the defendants. However, there is no basis for an award of punitive damages on these facts.[37] As plaintiffs acknowledge, although punitive

---

**37.** In any event, the amounts of punitive damages that plaintiffs suggest cannot be supported, especially in light of the Supreme Court's recent decision in *State Farm Mutual Automobile Insurance Co. v. Campbell,* —— U.S. ——, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In State Farm Mutual, the Supreme

Court reiterated three guideposts it set forth in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), for affixing awards of punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered

damages are allowed under the Flatow Amendment, punitive damages are not available against Iraq because 28 U.S.C. § 1606 immunizes foreign states from liability for punitive damages. *See, e.g., Elahi v. The Islamic Republic of Iran*, 124 F.Supp.2d 97, 113–114, 113 n. 17 (D.D.C. 2000). Furthermore, the Flatow Amendment does not apply to the al Qaeda defendants. The plaintiffs' claims against the al Qaeda defendants are brought under § 2333 of the ATA, which provides for treble damages and attorneys fees but does not provide for punitive damages. To the extent that § 2333's treble-damages provision already provides a penalty, this Court is foreclosed from assessing additional punitive damages against the al Qaeda defendants.[38]

## IV. CONCLUSION

In summary, the Court holds that plaintiffs have carried their burden against the defendants and damages are awarded as follows:

With respect to the estate of George Eric Smith and his heirs, all defendants are jointly and severally liable to the estate for $1,113,280 for economic losses and $1 million for pain and suffering. The al Qaeda defendants are liable for an additional amount of $4,229,560 for economic losses and pain and suffering. Iraq is liable to Mr. Smith's relatives for loss of solatium as follows: $3 million for Marion Thomas; $1 million for Raymond Anthony Smith; $500,000 for Deborah Sallad; and $250,000 for Raymond Smith.

by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mutual*, 123 S.Ct. at 1520. The defendants' conduct here scores high on the scale of reprehensibility, which the Court in *State Farm Mutual* stated was "[the] most important indicium of the reasonableness of a punitive damage award is the degree of reprehensibility of the defendant's conduct." *Id.* at 1520 (quoting *Gore*). However, the Supreme Court stated that punitive damages in general should be no more than a single-digit multiple of compensatory damages, except in unique situations such as "where 'a particularly egregious act has resulted in only a small amount of economic damages' ... [or] where 'the injury is hard to detect or the monetary value of the noneconomic harm might have been difficult to determine.'" *See id.* at 1524 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589). Furthermore, the Supreme Court has rejected the plaintiffs' view that the victims of terrorist acts stand as surrogates of—*i.e.*, and can recover on behalf of—civilized society in general.

**38.** *Arnott v. American Oil Co.*, 609 F.2d 873–888 (8th Cir.1979) (disallowing punitive damages for Clayton Act violations where statute allows recovery of treble damages); *Glover v. General Motors Corp.*, 959 F.Supp. 332, 334 (W.D.Va.1997) (holding that federal odometer-tampering statute which provided for treble damages and attorneys fees precluded additional award of punitive damages); *Concrete Spaces, Inc., v. Henry Sender*, 2 S.W.3d 901, 906 (Tenn.1999) ("Almost every jurisdiction addressing this question has concluded that recovery of both multiple statutory damages and punitive damages constitutes an impermissible double recovery because the two forms of enhanced damages serve the same functions.... Because multiple damages are punitive in nature and not intended to compensate for the plaintiff's injury, a plaintiff cannot recover both punitive damages and multiple damages in the same cause of action, even if they are each available, because receipt of both forms of enhanced damages violates the principle against double recovery." (citations omitted)); *Benson v. Richardson*, 1990 WL 290144 (N.D.Iowa July 16, 1990) (finding defendants liable for both treble damages pursuant to RICO and punitive damages, but disallowing recovery of both); *cf. Bullman v. D & R Lumber Co.*, 195 W.Va. 129, 464 S.E.2d 771, 775–77 (1995) (allowing recovery of punitive damages where state statute provided for treble damages, but noting that "[u]nder most legislative schemes, when a statute creates a cause of action and provides the remedy, the remedy is exclusive unless the statute states otherwise").

With respect to the estate of Timothy Soulas and his heirs, all defendants are jointly and severally liable to Timothy Soulas's estate for $15,139,203.19 for economic losses and $3 million for pain and suffering. The al Qaeda defendants are liable for an additional amount of $35,278.406.38 for economic losses and pain and suffering. Iraq is liable to Mr. Soulas's relatives for loss of solatium as follows: $10 million for Tim Soulas' wife Katherine; $3 million for his father and each of his 6 children (Timothy Jr., Andrew, Christopher, Matthew, Nicole, and Daniel); and $2 million for each of his siblings (Frederick III, Stephen, Daniel, and Michelle).

The Clerk of the Court is ordered to close this case and any pending motions and remove the matter from my docket.

**IT IS SO ORDERED.**